**UNITED STATES v. PEACE IN-
FORMATION CENTER et al.**

Crim. No. 178-51.

United States District Court
District of Columbia.

May 8, 1951.

258

George Morris Fay, U. S. Atty., Harold H. Bacon, Asst. U. S. Atty., Washington, D. C., F. Kirk Maddrix, J. Frank Cunningham, and Joseph A. Roney, Sp. Assts. to the Atty. Gen., for the United States.

Gloria Agrin and Stanley Faulkner, both of New York City, George A. Parker, and George E. C. Hayes, both of Washington, D. C., for the defendants.

HOLTZOFF, District Judge.

The defendant Peace Information Center has been indicted on a charge of violating the Foreign Agents Registration Act,[1] in failing to register as an agent of a foreign principal. The individual defendants are charged in their capacity as officers and directors of Peace Information Center with failure to cause the latter to register. The defendants move to dismiss the indictment on the ground that the statute is unconstitutional, and on the further ground that the indictment is defective.

The Foreign Agents Registration Act requires every agent of a foreign principal to file a registration statement with the Attorney General setting forth certain information specified in the statute. In brief, a foreign principal is defined as a government of a foreign country, a foreign political party, or an individual affiliated or associated with either of them; a person outside of the United States; an organization having its principal place of business in a foreign country; or a domestic concern subsidized by any one of the former. The Act further defines the term "agent of a foreign principal". In effect, the definition includes any person who acts as a publicity agent or public-relations counsel for a foreign principal; any person who collects information, or reports information to a foreign principal; and any person who engages in other similar activities that are described in the Act in considerable detail. Diplomatic and consular representatives, persons engaged in trade or commerce and press associations are expressly exempted. The Act provides that no person shall act as an agent of a foreign principal unless he has filed a registration statement with the Attorney General. The Act further requires every person who is an agent of a foreign principal to file a registration statement with the Attorney General. The contents of the statement are prescribed. A wilful violation of the Act is made a criminal offense.

The intent and purpose of the Congress in enacting this measure appear from

---

1. Act of June 8, 1938, 52 Stat. 631, as amended, 22 U.S.C.A. § 611 et seq.

the following statement found in the report of the Committee on the Judiciary of the House of Representatives, recommending passage of the legislation (H.Rept.No.1381, 75th Cong. 1st Sess., July 28, 1937):

"Incontrovertible evidence has been submitted to prove that there are many persons in the United States representing foreign governments or foreign political groups, who are supplied by such foreign agencies with funds and other materials to foster un-American activities, and to influence the external and internal policies of this country, thereby violating both the letter and the spirit of international law, as well as the democratic basis of our own American institutions of government.

"Evidence before the Special Committee on Un-American Activities disclosed that many of the payments for this propaganda service were made in cash by the consul of a foreign nation, clearly giving an unmistakable inference that the work done was of such a nature as not to stand careful scrutiny.

"As a result of such evidence, this bill was introduced, the purpose of which is to require all persons who are in the United States for political propaganda purposes—propaganda aimed toward establishing in the United States a foreign system of government, or group action of a nature foreign to our institutions of government, or for any other purpose of a political propaganda nature—to register * * * and to supply information about their political propaganda activities, their employers, and the terms of their contracts.

"This required registration will publicize the nature of subversive or other similar activities of such foreign propagandists, so that the American people may know those who are engaged in this country by foreign agencies to spread doctrines alien to our democratic form of government, or propaganda for the purpose of influencing American public opinion on a political question."

In Viereck v. United States, 318 U.S. 236, 241, 63 S.Ct. 561, 563, 87 L.Ed. 734, which involved a conviction under this statute, Chief Justice Stone gave the following explanation of the objectives of the Act: "The Act of 1938 requiring registration of agents for foreign principals was a new type of legislation adopted in the critical period before the outbreak of the war. The general purpose of the legislation was to identify agents of foreign principals who might engage in subversive acts or in spreading foreign propaganda, and to require them to make public record of the nature of their employment. But the means adopted to accomplish that end are defined by the statute itself, which, as will presently appear more in detail, followed the recommendations of a House Committee which had investigated foreign propaganda. These means included the requirement of registration of agents for foreign principals—with which it appears that petitioner complied—and the requirement that the registrant gave certain information concerning his activities as such agent." The constitutionality of the statute was evidently assumed in that case, for it was not discussed.

■ The objection that the statute is invalid will be first considered. The question of constitutionality of an Act of Congress must be approached from two standpoints and involves two basic considerations. First, is the subject matter of the statute within the legislative powers of the Congress? Second, does the statute transcend any limitation on the exercise of these powers?

■ As concerns the first of these aspects, we find two distinct bases in the powers of the Congress justifying action regarding the subject matter covered by the Act. One is the authority of the Congress to legislate on the subject of foreign relations. The power of the Federal Government in respect to external affairs differs drastically in its origin from that in respect to domestic matters. The former is not derived from the Constitution. It is not among the enumerated or implied powers conferred by the Constitution on the Federal Government. It is an inherent power that came into being before the adoption of the Constitution and now exists outside of the fundamental instrument. It is a power that automatically passed from Great Britain to the United States as

260

an entity, and not to the individual States, when the external sovereignty of Great Britain in respect to the colonies came to an end.

This doctrine was developed and approved by the Supreme Court in the epoch-making opinion of Mr. Justice Sutherland in United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 315–318, 57 S.Ct. 216, 219, 81 L.Ed. 255:

"It will contribute to the elucidation of the question if we first consider the differences between the powers of the federal government in respect of foreign or external affairs and those in respect of domestic or internal affairs.

\*　\*　\*　\*　\*　\*

"The two classes of powers are different, both in respect of their origin and their nature. The broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the enumerated powers, is categorically true only in respect of our internal affairs. In that field, the primary purpose of the Constitution was to carve from the general mass of legislative powers *then possessed by the states*[2] such portions as it was thought desirable to vest in the federal government, leaving those not included in the enumeration still in the states. Carter v. Carter Coal Co., 298 U.S. 238, 294, 56 S.Ct. 855, 865, 80 L.Ed. 1160. That this doctrine applies only to powers which the states had, is self-evident. And since the states severally never possessed international powers, such powers could not have been carved from the mass of state powers but obviously were transmitted to the United States from some other source. During the Colonial period, those powers were possessed exclusively by and were entirely under the control of the Crown. \* \* \*

"As a result of the separation from Great Britain by the colonies, acting as a unit, the powers of external sovereignty passed from the Crown not to the colonies severally, but to the colonies in their collective and corporate capacity as the United States of America. Even before the Declaration, the colonies were a unit in foreign affairs, acting through a common agency—namely, *the Continental Congress*, composed of delegates from the thirteen colonies. That agency exercised the powers of war and peace, raised an army, created a navy, and finally adopted the Declaration of Independence. \* \* \* When, therefore, the external sovereignty of Great Britain in respect of the colonies ceased, it immediately passed to the Union. \* \* \*

"The Union existed before the Constitution, which was ordained and established among other things to form 'a more perfect Union.' Prior to that event, it is clear that the Union, declared by the Articles of Confederation to be 'perpetual,' was the sole possessor of external sovereignty, and in the Union it remained without change save in so far as the Constitution in express terms qualified its exercise. \* \* \*

\*　\*　\*　\*　\*　\*

"It results that the investment of the federal government with the powers of external sovereignty did not depend upon the affirmative grants of the Constitution. The powers to declare and wage war, to conclude peace, to make treaties, to maintain diplomatic relations with other sovereignties, if they had never been mentioned in the Constitution, would have vested in the federal government as necessary concomitants of nationality."

 The power over external relations of the United States is extensive. It authorizes the Federal Government to deal with all phases of this subject. It comprizes not only authority to regulate relations with foreign countries, but also to prohibit any disturbance or interference with external affairs. The Congress has legislated in respect to many topics in this broad field. For example, it is a criminal offense for a person, other than a diplomatic or consular official or attache, to act in the United States as an agent of a foreign government without prior notification to the Secretary of State;[3] or falsely to

2. Emphasis original.

3. 18 U.S.C.A. § 951.

assume or pretend to be an official of a foreign government accredited to the United States with intent to defraud anyone.[4] Similarly, it is a criminal offense wilfully and knowingly to make a false statement under oath which may be used to influence the measures or the conduct of a foreign government to the injury of the United States, or to influence any measure or action by the United States to its injury.[5] A conspiracy to destroy property belonging to a foreign government is punishable as a crime.[6] The export of munitions of war has been prohibited under various circumstances.[7] The United States has the inherent power to exclude and deport undesirable aliens.[8] Citizens of the United States are forbidden to carry on correspondence or intercourse with any foreign government with an intent to influence its measures or conduct in relation to any disputes or controversies with the United States.[9]

The Act under scrutiny in this case represents the converse of the last mentioned statute. The former deals with citizens of the United States who attempt to conduct correspondence with foreign governments. The latter affects agents of foreign principals who carry on certain specified activities in the United States. Both matters are equally within the field of external affairs of this country, and, therefore, within the inherent regulatory power of the Congress.

The second foundation for the statute here under consideration is found in the powers conferred on the Congress by the Constitution to legislate concerning national defense. As indicated in United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 315, 57 S.Ct. 216, 81 L.Ed. 255, the powers of the Federal government in respect to internal affairs are those that are specifically enumerated in the Constitution as well as such implied powers as are necessary and proper to carry into effect the enumerated powers. The enumerated powers are to be broadly construed.[10] Support for legislation need not necessarily be found in a single power, but may be derived from a composite of several powers.

The government has the power of self-preservation. It must have the capacity to protect itself from attempts to destroy it. It must assure its own survival. Americans are a freedom-loving people. They want their liberty to endure permanently. They have a right to defend it against all efforts, be they open or insidious, to subvert or destroy it.

The power of the Congress to legislate concerning the national defense includes power to declare war, to raise and support armies, to provide and maintain a navy, as well as the power to make all laws necessary and proper for carrying into execution the foregoing powers.[11] These powers necessarily include authority to take preventive measures against activities that may cause international misunderstandings, which, in turn, may lead to war, as well as against endeavors to subvert, undermine, or overthrow the government. It is clearly within the ambit of the powers relating to national defense to legislate concerning propaganda carried on in this country by foreign agents. History demonstrates that such activities may affect the safety and the international position of this country, as was notably the fact in the episode of Citizen Genet in the early years of this republic. Such propa-

4. 18 U.S.C.A. § 915.

5. 18 U.S.C.A. § 954.

6. 18 U.S.C.A. § 956.

7. 18 U.S.C.A. § 968.

8. Fong Yue Ting v. United States, 149 U.S. 698, 705, 13 S.Ct. 1016, 37 L.Ed. 905.

9. 18 U.S.C.A. § 953.

10. McCulloch v. Maryland, 4 Wheat. 316, 407, 4 L.Ed. 579; Gibbons v. Ogden, 9 Wheat. 1, 187, 189, 222, 6 L.Ed. 23; Legal Tender Cases, 12 Wall. 457, 532, 20 L.Ed. 287; Juilliard v. Greenman, 110 U.S. 421, 439, 4 S.Ct. 122, 28 L.Ed. 204; Fairbank v. United States, 181 U.S. 283, 287, 21 S.Ct. 648, 45 L.Ed. 862; Matter of Strauss, 197 U.S. 324, 330, 25 S.Ct. 535, 49 L.Ed. 774; State of Kansas v. Colorado, 206 U.S. 46, 88, 27 S.Ct. 655, 51 L.Ed. 956.

11. United States Constitution, Article I, Section 8.

ganda may also be used to attempt to overthrow the government. The conclusion is inescapable that the statute in question is within the powers of the Congress.

This brings us to a consideration of the second phase of the issue of constitutionality, namely, whether the statute transcends any limitations on the powers of the Congress. The defendants advance three contentions in respect to this matter: first, that the statute is repugnant to the guarantee of freedom of speech contained in the First Amendment; second, that the statute violates the privilege against self-incrimination found in the Fifth Amendment; and third, that the statute is violative of the due process clause of the Fifth Amendment, in that it is too indefinite and does not formulate an ascertainable standard of guilt. The greatest emphasis is laid by the defendants on the first of these objections, namely, the alleged interference with the right of freedom of speech guaranteed by the First Amendment.

Freedom of speech is one of the basic rights safeguarded by the Constitution. It is perhaps one of the greatest of these privileges, second only to the right to a fair trial. It is an elementary principle, however, that freedom of speech is not absolute and unlimited, but is bounded by the rights of others than the speaker. For example, no one may disseminate obscene matter in the name of freedom of speech. No one is permitted to make a statement that may incite a riot or create a panic. No one may urge or advise the commission of a crime. No one may advocate the overthrow of the government by force or violence. No one may justify fraudulent or deceptive advertising by recourse to the right of freedom of speech. Many a crime is committed purely by word of mouth, such as obtaining money by false pretenses, extortion, broadcasting treasonable utterances, and many others. This list may be multiplied *ad infinitum*. The right of freedom of speech is no defense to a prosecution for any of these offenses.

The statute under consideration neither limits nor interferes with freedom of speech. It does not regulate expression of ideas. Nor does it preclude the making of any utterances. It merely requires persons carrying on certain activities to identify themselves by filing a registration statement.

It is urged, however, that the requirement of registration constitutes a burden on the exercise of freedom of speech and that Congress in attempting to impose such a burden acted in violation of the First Amendment. In support of this contention, the defendants rely on Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430. True, there are isolated expressions in the opinion of the Court, written by Mr. Justice Rutledge, which seem to lend support to this argument. An analysis of the case, however, indicates that the actual decision does not do so. The litigation involved a Texas statute requiring every labor union organizer operating within the State to apply for an organizer's card. The Secretary of State was required to issue such a card upon the filing of the application. The petitioner was an officer of a labor organization residing outside of the State. He came into Texas and made a speech, at the conclusion of which he urged members of the audience to join a specific labor union and then called upon an individual member of the audience to do so. Prior to the delivery of the address an injunction was issued by a local court restraining the petitioner from soliciting memberships for the union in question without first obtaining an organizer's card. The petitioner, however, failed to apply for such a card or to heed the injunction. After the speech was concluded, he was arrested and committed for contempt of court. A review of the commitment was sought in a *habeas corpus* proceeding, which eventually reached the Supreme Court. The Supreme Court held that the right to make a speech might not be restricted by a statute such as had been enacted by the Texas legislature and reversed the conviction. The case did not hold, however, that the State was powerless to require a person conducting the activities of a labor union organizer to register and procure a card for that purpose, just as a person who desires to engage in the occupation of a lawyer, physician, pharmacist, or any one of many other

vocations, may be required to procure a license, or to register. That this was the decision of the Court is clearly demonstrated by the following statement in the concurring opinion of Mr. Justice Jackson, 323 U.S. at page 548, 65 S.Ct. at page 331, 89 L.Ed. 430: "I concur in the opinion of Mr. Justice Rutledge that this case falls in the category of a public speech, rather than that of practicing a vocation as solicitor." Even so, Mr. Justice Roberts, Chief Justice Stone, Mr. Justice Reed and Mr. Justice Frankfurter dissented.

The statute involved in the case at bar, paraphrasing the words of Mr. Justice Jackson, relates to practicing a vocation as an agent of a foreign principal, rather than to making a public speech. It is clear, therefore, that Thomas v. Collins, supra, is not authority for the contention that the Foreign Agents Registration Act is repugnant to the First Amendment.

Recent expressions of the Supreme Court on the right of freedom of speech are to be found in the opinion of Chief Justice Vinson in American Communications Ass'n v. Douds, 339 U.S. 382, 70 S.Ct. 674, 682, 94 L.Ed. 925. After repudiating an attempt to apply the term "clear and present danger" as a mechanical test in every case touching the First Amendment freedoms, the Chief Justice states: "Although the First Amendment provides that Congress shall make no law abridging the freedom of speech, press or assembly, it has long been established that those freedoms themselves are dependent upon the power of constitutional government to survive. If it is to survive it must have power to protect itself against unlawful conduct and, under some circumstances, against incitements to commit unlawful acts. *Freedom of speech thus does not comprehend the right to speak on any subject at any time.*" [12]

In another recent case, Kovacs v. Cooper, 336 U.S. 77, 88, 69 S.Ct. 448, 454, 93 L.Ed. 513, Mr. Justice Reed states: "To enforce freedom of speech in disregard of the rights of others would be harsh and arbitrary in itself."

It follows hence that the statute under scrutiny in the case at bar is not violative of the First Amendment.

The next objection raised against the validity of the statute is that it violates the privilege against self-incrimination conferred by the Fifth Amendment. The privilege against self-incrimination is, however, personal to the individual and may be either asserted or waived by him. It does not constitute a basis for invalidating a statute. For example, a corporation or an unincorporated association, such as the first named defendant in this case, does not possess the privilege and may not invoke it, United States v. White, 322 U.S. 694, 699, 64 S.Ct. 1248, 88 L.Ed. 1542.

Moreover, the statute does not require the disclosure of any information except on a voluntary basis as a condition of carrying on certain occupations or certain activities. The information called for by the statute is not incriminating on its face. If any specific item would be incriminating then the time to assert the privilege would be when the statement is filed, if, indeed, the privilege may be invoked at all. For instance, one may hardly argue than an applicant for admission to the bar who is asked concerning some complaint filed against him, may decline to answer on the ground that to do so would tend to incriminate him, and yet insist on being admitted to practice law.

The final objection to the constitutionality of the Act is that it is repugnant to the due process clause of the Fifth Amendment, in that its provisions are not sufficiently definite to establish and formulate an ascertainable standard of guilt. Undoubtedly, a criminal statute must define the crime. Otherwise it is lacking in due process and hence is unconstitutional.[13] The statute is, however, sufficiently precise. It requires the filing of a registra-

12. Emphasis supplied.

13. United States v. L. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516; Connally v. General Const. Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322.

**264**

tion statement. Obviously this provision is definite. The persons who are required to register are agents of foreign principals. A foreign principal is defined. An agent of a foreign principal is likewise defined. True, there may be borderline cases in which a person may have some doubt whether he is within the terms of the Act. This circumstance is not sufficient, however, to vitiate the law. It occurs in numerous statutes. Perhaps the most striking illustration is the Sherman Antitrust Act, 15 U.S.C.A. §§ 1–7, 15 note, which proscribes contracts, combinations, and conspiracies in restraint of trade or commerce. What constitutes a restraint banned by the Act is frequently a doubtful question. Yet the constitutionality of the statute was upheld as against an objection that it is too vague. The objection raised by the defendants in this Court is best disposed of in the following words of Mr. Justice Holmes in sustaining the validity of the Sherman Act, in Nash v. United States, 229 U.S. 373, 377, 33 S.Ct. 780, 781, 57 L.Ed. 1232: "But, apart from the common law as to restraint of trade thus taken up by the statute, the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death." This doctrine was recently followed in United States v. Petrillo, 332 U.S. 1, 7, 67 S.Ct. 1538, 91 L.Ed. 1877.

■ In the light of the foregoing discussion the Court reaches the conclusion that the statute is valid and is not subject to any constitutional infirmity.

■ The defendants further argue that the indictment is insufficient. It is well settled that under the Federal Rules of Criminal Procedure an indictment need contain only a plain, concise and definite written statement of the essential facts constituting the offense charged.[14] It suffices if the indictment apprizes the defendant of the specific charge that he is called upon to answer, and likewise contains sufficient facts to enable him to plead former jeopardy if he should be later confronted with the same accusation.[15] The Court is of the opinion that the indictment meets these tests.

Paragraph 5 of the indictment sets forth that the defendant Peace Information Center has unlawfully and wilfully failed to file a registration statement as an agent of a foreign principal. The principal is named.

Reverting to paragraph 2 of the indictment, we find that the principal is alleged to have been a foreign principal as defined in the Act.

■ Paragraph 3 of the indictment avers that the defendant Peace Information Center has been an agent of a foreign principal. It is argued that it is insufficient to allege that the defendant has acted as an agent without explaining in what manner he has done so. The indictment in this case, however, is not confined to such a general assertion. It goes on to state in what manner the defendant has acted as an agent: it avers that the defendant has acted and held itself out to be the publicity agent for, has reported information to, and has acted at the request of the foreign principal. The Court is of the opinion that the allegations of count 1 of the indictment are sufficient to charge an offense. Obviously, if count 1 is free from defects, it necessarily follows that count 2 is likewise sufficient.

Motion to dismiss the indictment is denied.

---

14. Fed.Rules Crim.Proc., Rule 7(c), 18 U.S.C.A.

15. United States v. Josephson, 2 Cir., 165 F.2d 82, 85; Morissette v. United States, 6 Cir., 187 F.2d 427, 429; United States v. Starks, D.C., 6 F.R.D. 43.