**UNITED STATES of America,**

**v.**

**Samuel SACK and Perry Metal Products Company, Inc., Defendants.**

United States District Court, S. D. New York.

Nov. 4, 1954.

J. Edward Lumbard, U. S. Atty.,
Southern Dist. of N. Y., New York City,
Leon Silverman, Asst. U. S. Atty., New
York City, of counsel, for the United
States.

William Weisman, New York City, for
defendants.

PALMIERI, District Judge

The defendants were indicted on February 29, 1952. The indictment charges that in January and April, 1946, they had furnished the War Contracts Price Adjustment Board with certain false financial data about the corporate defendant in violation of the Renegotiation Act of 1942, 50 App.U.S.C. § 1191 (1952 ed.), 50 U.S.C.A.Appendix, § 1191.

The indictment contains two counts. The first count charges than on January 24, 1946, the defendants unlawfully, wilfully and knowingly furnished the War Contracts Price Adjustment Board with a financial statement for the fiscal year ended June 30, 1945, which was false and misleading in material respects in that it stated the corporation's net income to be $61,316.50, whereas the defendants well knew the corporation's income was substantially in excess of that figure. The second count alleges that on April 22, 1946, the defendants unlawfully, wilfully and knowingly furnished the Board with a standard form of contractor's report for the fiscal year ended June 30, 1945, which was false and misleading in material respects in that in response to an item which required an estimate of profits arising from renegotiable fixed price business, it was stated to be $35,000, whereas the defendants

well knew that the correct response was a figure substantially in excess of $35,000.

The defendants move to dismiss the indictment on two grounds: first, that it is insufficient as a matter of law; and second, that it is barred by the generally applicable three year Statute of Limitations, 18 U.S.C. § 3282 (1952 ed.). They attack the indictment because (1) it does not contain allegations to the effect that the statute required them to file the financial statements that they did file and (2) they believe that the allegation that the financial statements were false or misleading in any material respect is not sufficiently pleaded.

The defendants argue that the indictment is deficient in four vital respects. They say: first, it should have alleged that the defendants were contractors or subcontractors who held contracts or subcontracts; second, it should have stated that the provisions of 50 App.U.S.C. § 1191(c), 50 U.S.C.A.Appendix, § 1191(c) applied to the defendants; third, it failed to allege that the financial statements involved were required by regulations of the War Contracts Price Adjustment Board; and fourth, it should have alleged that the alleged misstatements were false in a "material" respect, the use in each count of the word "substantial" being insufficient to charge a material misstatement.

The defendants claim to be entitled to the formalistic type of pleading which the draftsmen of the Federal Rules of Criminal Procedure intended to abolish. The defendants cavil at the failure of Government counsel to use the precise language of the statute in every possible detail. But preciousness of expression is not the hallmark of good pleading, and the specificity and precision formerly required are no longer necessary. See Parsons v. United States, 5 Cir., 1951, 189 F.2d 252, 253; Donnelly v. United States, 10 Cir., 1950, 185 F.2d 559, and Ochoa v. United States, 9 Cir., 1948, 167 F.2d 341, 345.

The defendants' objection to the use of the word "substantial" and the characterization of its use as "a palpable defect with respect to a vital aspect of the indictment" are not justified. In each count of the indictment the allegedly false financial statements are characterized as "false and misleading in material respects." It is only with respect to the figures by which the financial statements were misleading that the expression "substantially in excess" was used in both counts. Hence it is clear that the indictment sufficiently charges that the alleged misstatements were material.

The defendants do not claim that they have been prejudiced by the allegations of this indictment. Nor do they show that any desirable purpose would be served if the indictment contained the allegations that are, according to them, necessary. They have taken an invalid, legalistic position, unjustified by the terms and spirit of Rule 7(c) of the Federal Rules of Criminal Procedure, 18 U.S.C.

In my opinion, the indictment is sufficient under the standards set forth in Rule 7(c) of the Federal Rules of Criminal Procedure. It is "a plain, concise and definite written statement of the essential facts constituting the offense charged." From the standpoint also of its basic legal requirements, apart from the formal nature of the allegations, this indictment meets the crucial tests of (1) enabling the accused to prepare their defense and obviating surprise at the trial and (2) protecting them against another prosecution for the same offense. See United States v. Rosenberg, D.C.S.D.N.Y.1950, 10 F.R.D. 521, 523; United States v. Peace Information Center, D.C.1951, 97 F.Supp. 255, 264.

The defendants' second contention is that the indictment is barred by the generally applicable three year statute of limitations, 18 U.S.C. § 3282 (1952 ed.), because it was found on February 29, 1952, more than three years after the dates on which the alleged offenses were committed. But the Government contends that the indictment was filed in good time because prosecution of the defendants was not barred until December 31, 1952, in view of the applicability of

the Wartime Suspension of Limitations Act of 1942, 56 Stat. 747 (1942), as amended by Section 19(b) of the Contract Settlement Act of 1944, 58 Stat. 667 (1944), 18 U.S.C. § 590a (1946 ed.),[1] which I shall refer to as the Suspension Act.

The Government relies on the following portion of the Suspension Act:

"The running of any existing statute of limitations applicable to any offense against the law of the United States . * * * committed in connection with the negotiation, procurement, award, performance, payment for, interim financing, cancelation or other termination or settlement, of any contract, subcontract, or purchase order which is connected with or related to the prosecution of the present war * * * shall be suspended until three years after the termination of hostilities in the present war as proclaimed by the President or by a concurrent resolution of the two Houses of Congress. * *"

The termination of hostilities occurred on December 31, 1946, pursuant to Presidential Proclamation, No. 2714, 61 Stat. (Pt. 2) 1048–1049, 50 App.U.S.C. § 601, note (1952 ed.), 50 U.S.C.A.Appendix, § 601 note, and the defendants admit that the indictment found against them on February 29, 1952 was not barred if the offense for which they were indicted comes within the purview of the Suspension Act. See United States v. Grainger, 1953, 346 U.S. 235, 73 S.Ct. 1069, 97 L.Ed. 1575. Moreover, the defendants concede that the financial statements filed by the corporate defendant were connected with a "contract, subcontract, or purchase order which is connected with or related to the prosecution" of World War II. Therefore, the only question presented is whether the offense of furnishing false financial statements to the War Contracts Price Adjustment Board, the administrative agency responsible for the renegotiation of contracts, is an "offense * * *

committed in connection with the negotiation, procurement, award, performance, payment for, interim financing, cancelation or other termination or settlement, of any contract, subcontract, or purchase order * * *."

I believe that it is.

■ The purpose of the Suspension Act was to give the Government's law enforcement officials additional time to discover and punish offenses related to the commercial aspects of the war program. Because of the extensive war effort, these offenses could not be dealt with within a three year limitation period. First, the volume of transactions in which the Government was engaged as a result of the war made the three year period too short for effective law enforcement. Second, the fact that many law enforcement officials were preoccupied with offenses in the more vital areas of espionage and sabotage, prevented them from devoting their attention to offenses related to the commercial aspect of the war program. See H.R.Rep.No. 2051, 77th Cong., 2d Sess. 2 (1942).

Renegotiation of contracts was related to the commercial aspect of the war. It was a method of determining the amount of excessive profits derived from contracts with the Government, and recovering the excess. Contractors were required to file annual financial statements with the Board in order to help the Board determine whether excessive profits had been made. The Board then had one year to commence renegotiation proceedings. If it failed to do so within the one year "all liabilities of the contractor or subcontractor for excessive profits received or accrued during such fiscal year * * * (were) discharged. * * *" 50 App.U.S.C. § 1191(c) (3) (1952 ed.), 50 U.S.C.A.Appendix, § 1191 (c) (3).

In view of the purpose of the Suspension Act, the severe limitations of time under which the Board operated, and the very significant role of the financial statements furnished by con-

---

1. Now 18 U.S.C. § 3287.

tractors, I hold that the offense of furnishing false financial statements to the War Contracts Price Adjustment Board in connection with renegotiation is an "offense \* \* \* committed in connection with the negotiation \* \* \* payment for \* \* \* or other \* \* \* settlement, of any contract, subcontract, or purchase order." Although the term renegotiation is not used in the statute, its meaning is implicit in the words and purpose of the law. I think it can be said that renegotiation is included in "negotiation" because it is a resumption of the original negotiation of the contracts held by a contractor. At the time of the initial negotiation the Government and the contractor were often unable to estimate with any accuracy the cost of producing the article contracted for. Renegotiation was a resumption of contract negotiations in the light of pertinent facts subsequently disclosed. Indeed, since the statute required contracts to contain clauses providing for renegotiation, the resumption of negotiations can be said to have been contemplated by the parties and voluntary. See 50 App. U.S.C. § 1191(b) (1952 ed.), 50 U.S.C.A. Appendix, § 1191(b). Renegotiation may also be deemed to be "payment for" because, until after renegotiation, the payments made or to be made to a contractor were provisional only, in view of the Government's power to recapture any excessive profit. Thus, final payment for contracts depended on renegotiation. Renegotiation is also included in the phrase "other \* \* \* settlement", for it was a way of finally settling the rights of the parties under the original contracts.

Defendants argue that the amendment of the Wartime Suspension of Limitations Act of 1942 by Section 19(b) of the Contract Settlement Act of 1944 was intended to deal solely with offenses growing out of the subject matter of the Contract Settlement Act. This argument cannot be sustained. Indeed, the language of the Amendment serves to fortify the conclusion that furnishing false financial statements to the War Contracts Price Adjustment Board is an offense to which the Suspension Act applies. The purpose of the Contract Settlement Act of 1944 was to set up a procedure for dealing with the termination of war contracts, i. e., with arranging for payments to contractors when the Government cancelled a contract because it no longer wanted the article contracted for. See 41 U.S.C. § 103(d) (1952 ed.), 41 U.S.C.A. § 103(d). But the amendment of the Suspension Act did not confine itself to termination of contracts. It applied to "any offense against the laws of the United States \* \* \* committed in connection with the negotiation, procurement, award, performance, payment for, interim financing, cancelation, or other termination or settlement" of war contracts. See 58 Stat. 667 (1944). In my opinion, the broad sweep of this language is a clear indication of a Congressional intent to deal with all offenses relating to war contracts, including those involving renegotiation.

The motion to dismiss the indictment must therefore be denied.