Russell G. Hunt, J.
This proceeding was commenced pursuant to article 78 of the Civil Practice Act to require the respondent trustees to withhold the use of publicly owned and supported *968 educational facilities of the State University at Buffalo from an avowed member of the Communist party (and so known to the trustees, it was admitted in the answer and upon the argument herein), in accordance with their statement of “ Policy on use of university facilities ” made in September, 1956 (annexed to the answer herein) and wherein it was declared that the use of such facilities would be denied to 1 ‘ persons who advocate the over-throw of our government by violence
It appears that during the time the facilities in question were owned and operated by the University of Buffalo, a private institution, an invitation was extended to Herbert Aptheker, a ranking member of the Communist party, to use the facilities of that university to expound communism to the students and the public. Prior to the appearance of the speaker, that university was, on August 31,1962, merged with the State University (Education Law, § 355; see, also, L. 1962, ch. 980); title to the real property vested in the People of the State of New York and such became publicly owned and supported for higher educational purposes pursuant to section 352 of the Education Law. It is not asserted, however, that the respondent trustees assumed any contractual obligation in respect of Mr. Aptheker as a result of the merger. The State University is a corporation created within the State Education Department and “ under the board of regents ” (Education Law, § 352). Its “ planning functions ” and “ administrative functions ” are subject to the general supervision and approval of the Board of Regents (§§ 354, 355). It11 is an integral part of the government of the State ” (State Univ. of N. Y. v. Syracuse Univ., 285 App. Div. 59, 61) and as such is subject to the immediate control of the Board of Regents. The latter is the head of the University of the State of New York and of the State Education Department and is charged with the general management and supervision of all education in the State (N. Y. Const., art. V, § 4; art. XI, § 2; Education Law, §§ 101, 201, 207). In 1949 the State Legislature (L. 1949, ch. 360) declared the Communist party to be subversive and directed the Board of Regents “ to take affirmative action to meet this grave menace ’ ’. The Regents, after notice and hearing, listed as subversive the Communist party of the United States and the Communist party of New York State. Members of that party may not be employed in the State’s publicly owned and operated schools, colleges and other institutions of higher education (Education Law, § 3022; see, also, L. 1958, ch. 503; Matter of Adler v. Wilson, 203 Misc. 456, affd. 282 App. Div. 418, motion for leave to appeal denied 306 N. Y. 981; Lederman v. Board of Educ. of City of N. Y., 276 *969 App. Div. 527, affd. 301 N. Y. 476, appeal dismissed 342 U. S. 801, affd. 342 U. S. 485). Officers and employees of the State or of any civil division of the State may not be members of the Communist party and retain their positions (Civil Service Law, § 105; see Lederman v. Board of Educ. of City of N. Y., supra). Section 665-a of the Judiciary Law declares ineligible for jury service a member of the Communist party and anyone who belongs to a subversive organization. (See, also, Executive Law, § 167.) Our Court of Appeals has held that the Communist party is subversive (Matter of Daniman v. Board of Educ. of City of N. Y., 306 N. Y. 532, 541). In Matter of Lerner v. Casey (2 A D 2d 1, affd. 2 N Y 2d 355, affd. 357 U. S. 468) it was said (2 A D 2d 1, 5): “It cannot be gainsaid that the communist conspiracy is a cancer threatening our nation’s existence.” The Congress of the United States has so pronounced (U. S. Code, tit. 50, ch. 23) and, so, too, the United States Supreme Court (see Dennis v. United States, 341 U. S. 494, 547). The facts behind these pronouncements “are so well established and known that recognition of them without further proof is a right and duty (see East New York Sav. Bank v. Hahn, 293 N. Y. 622, 627, affd. 326 U. S. 230).” (Matter of Albertson v. Lubin, 8 N Y 2d 77, 85, revd. on other grounds sub nom. Communist Party v. Catherwood, 367 U. S. 389.) This is our public policy. Public policy of the State is “ set forth in its constitution, statutes and judicial records ” (Lerner v. Casey, 138 N. Y. S. 2d 777, 785, affd. 2 A D 2d 1, affd. 2 N Y 2d 355). And, ‘ ‘ ‘ Whatever is injurious to the interests of the public is void, on the grounds of public policy ’ (Naylor, Benzon & Co. v. Krainische Industrie Gessellschaft, [1918] 1 K. B. 331, 342, 343) ” (Flegenheimer v. Brogan, 284 N. Y. 268, 272).
It is appropriate and timely to refer, also, to the 1962 “FBI Annual Report ” of John Edgar Hoover, Director of the Federal Bureau of Investigation, U. S. Department of Justice, wherein Mr. Hoover (the official expert in this country on communism) reported (p. 25) that “ The international communist conspiracy, an avowed enemy of the democratic system of government, is constantly assaulting this Nation with its spies, its propaganda and its domestic adherents ”; and, of significance, in relation to the instant case, is the statement (p. 28) that “ Most successful of all its efforts was its speaking campaign, especially before college groups. From late October 1961 through May 1962, leaders of the Communist Party, U. S. A., made 48 speeches before groups of college students all across the nation. Approximately 43,000 persons heard these talks. Encouraged by the early success of college appearances the Party established a *970 lecture and information bureau and early in 1962 sent a letter to college newspaper editors offering speakers on communism. Near the end of the 1962 fiscal year, the party already was lining up speeches for the coming academic year ”. In a speech delivered on October 9, 1962, before the National Convention of the American Legion at Las Vegas, Mr. Hoover said, “ The communists are experts in the practice of treachery and deceit * * * Foremost among their targets have been America’s young people, for the aim of communism is world youth and the capture and corruption of that youth.” In relation to the Communist party’s speaking program before college groups he said that one of the speakers was the “Party’s general secretary, ex-convict G-us Hall” whose presence, on November 9,1962, with other well-known communists at the Bussian United Nations Mission in New York City, is a matter of public knowledge. From Moscow, Mr. Hoover said, the Communist party in this country, “ actually received orders and financial support ”. Moscow, he said, is “ the fountain head of world communism ”. See, also, the review of Cus Hall’s pamphlet “End the Cold War” which was “prepared by the Lecture Information Bureau of the C. P. U. S. A,” and published in “Political Affairs ” for September, 1962, a publication of the Communist party, of which Herbert Aptheker is editor. The pamphlet, described by the editor as “ interesting and helpful”, emphasizes the importance of Communist party speakers having access to colleges and schools and the youth of the country in furtherance of communism. The review stresses the importance, amongst other things, of Communist party workers arranging “ to speak on radio and in colleges. It requires struggle in many cases, but it can be done ”; and, also, “ to pay the greatest attention to youth”. In the public letter of the Hon. Walter J. Mahoney, Temporary President and Majority Leader of the New York State Senate, to the Chairman of the respondent Board of Trustees, and made a part of respondents’ answer herein, protesting against the use of the State University’s educational facilities for the advocacy of communism by Mr. Aptheker, he pointed out that Cus Hall had been barred from the campus of Fairleigh Dickinson University upon the ground that he ‘ ‘ has thoroughly disqualified himself as a recipient of the traditional privileges of an academic and intellectual community in a free society ”. Senator Mahoney said, also, that “ It is the established policy of our government * * * that membership in the Communist Party, U. S. A., automatically entails advocacy of the overthrow of our government by force and violence This is a matter of which judicial notice will *971 be taken (Matter of Albertson v. Lubin, supra; Matter of Daniman v. Board of Educ. of City of N. Y., supra; Carlson v. 187 F. 2d 991, 997, affd. 342 U. S. 524, 565).
The respondents’ own statement of policy conforms with State policy. They must go all the way, however, and comply with State policy, in toto. Administratively, the trustees cannot apply a different policy. The State is supreme “ over its creatures ” and this the trustees must acknowledge (Black Riv. Regulating Dist. v. Adirondack League Club, 307 N. Y. 475, 488; see, too, Matter of Cash v. Bates, 301 N. Y. 258, 261).
The argument has been advanced, nevertheless, in extenuation, that the undefined phrase “ academic freedom ” is justification enough for students to invite, and, faculty and trustees to approve, a speaker to use the university’s facilities to expound the doctrine of a subversive organization, If thereby it is meant to convey the implication that somehow our freedoms are involved, then the argument is rhetorical. There is no involvement of the survival of the freedoms of the First Amendment of the Constitution of the United States, namely, freedom of speech, press and assembly. These could not be stifled “ ‘ while this Court sits ’ ” (Communications Assn. v. Douds, 339 U. S. 382, 410). We should be mindful that the freedoms are dependent upon the survival of constitutional government and that for the latter to survive it must have the power to protect itself against unlawful conduct and whatever is harmful to the public welfare and interest (id. p. 394; see, too, United States v. Peace Information Center, 97 F. Supp. 255, 261). The right to free expression is not unlimited, it ‘1 ceases at the point where it leads to harm to the government ” (Communist Party v. Subversive Activities Control Bd., 223 F. 2d 531, 544, revd. and remanded on other grounds 351 U. 8. 115). What the argument expresses, in essence, is a disagreement with the policy that State-owned facilities may not be used for the purpose of expounding a subversive doctrine to a student body on campus. It is no idle comment that, lacking the setting of the State University, the Communist expounder would not be hailed as a master of intellectual stimulation and he would be unable to attract an audience across the street to hear him. The sole question in this case is whether the respondent trustees must deny the use of the State-owned facilities to Mr. Aptheker.
It has been argued, also, on behalf of the trustees, since Mr. Aptheker is not in the employ of the State, that section 3022 of the Education Law and section 105 of the Civil Service Law are inapplicable under the facts and the prohibition thereof does not apply to him. This contention overlooks the trustees’ *972 own statement of policy as well as the State’s and such apply to Mr. Aptheker. He is not an innocent one. As a member of the Communist party he is “ in direct aid and support of its unlawful purpose ”. So said the United States Supreme Court in 1874 in Sprott v. United States (20 Wall. [87 U. S.] 459) a case concerning a business transaction with the Confederate States and which the court said (p. 465) “ was inimical to social order, destructive to the best interests of society and its primary object was to overthrow the government ”. In Communications Assn. v. Douds (supra) Mr. Justice Jackson in his concurring opinion said (p. 431) that “Every member of the Communist Party is an agent to execute the Communist program ”.
The respondents have made the additional defense which is sufficient, they say, to call for a dismissal of the petition herein. It is that the petitioner is not an “ aggrieved party ” and has no “individual interest, personal to him”, sufficient to cause the matter of the respondents’ action or inaction to be made the subject of judicial review. The defense is not good. It was so held in Matter of United Press Assns. v. Valente (308 N. Y. 71, 95) where the court, said: “ The fact that petitioners were not parties * * * does not preclude them as members of the public from instituting this article 78 proceeding (Matter of Public Service Comm. v. Norton, supra [prohibition]; Matter of Zorach v. Clauson, 303 N. Y. 161, 168, affd. 343 U. S. 306, 309 [certiorari]) A writ of mandamus was sustained in People ex rel. Stephens v. Halsey (37 N. Y. 344, 347 [1867]) “on the relation of one, who, in common with all other citizens, is interested in having some act done, of a general public nature, devolving as a duty upon a public officer or body, who refuse to perform it ’ ’. Furthermore, where an ‘ ‘ important public question is raised ” by a citizen against a State officer and an adjudication was considered required, ‘ ‘ mandamus has been treated as the appropriate remedy” under somewhat similar circumstances in Matter of Kuhn v. Curran (183 Misc. 942, 943). The Court of Appeals, while reversing the last case on the merits (294 N. Y. 207, 213) said, nevertheless, that “In view of the importance to the public of an authoritative determination of that question at the present time, we do not pause to consider whether the question is presented in appropriate proceedings ”. (See, also, People ex rel. Stephens v. Halsey, 37 N. Y. 344, 347; People ex rel. Daley v. Rice, 129 N. Y. 449; Matter of Cash v. Bates, 301 N. Y. 258, 261; Matter of New York Post Corp. v. Leibowitz, 286 App. Div. 760, revd. on other grounds 2 N Y 2d 677; Matter of Grand Jury Assn. v. Schweitzer, 11 A D 2d 761; People ex rel. Pumpyansky v. Keating, 168 N. Y. 390; Matter of *973 Chironna v. Watson, 304 N. Y. 255, 259; Matter of Mandle v. Brown, 4 A D 2d 283, 284; Matter of Otis v. Silverman, 3 A D 2d 752, 753; Matter of Bergerman v. Murphy, 199 Misc. 1008.)
The respondents’ defenses are insufficient and are dismissed, there is no triable issue of material fact and the matter is remanded to the respondent Board of Trustees for further proceedings not inconsistent with the foregoing.