ATTORNEY GENERAL of the United
States of America, Plaintiff,

v.

IRISH NORTHERN AID COMMITTEE,
Defendant.

No. 72 Civ. 2863.

United States District Court,
S. D. New York.

Aug. 7, 1972.

Whitney North Seymour, Jr., U. S. Atty., S.D.N.Y., New York City, for plaintiff by Joel B. Harris, Asst. U. S. Atty., and Brian K. Ahearn, Dept. of Justice.

Rabinowitz, Boudin & Standard, Frank Durkan, New York City, for defendant by Victor Rabinowitz, K. Randlett Walster and Frank Durkan, New York City.

OPINION

BAUMAN, District Judge.

The Attorney General of the United States has moved for a preliminary injunction pursuant to § 7(f) of the Foreign Agents Registration Act of 1938, as amended [1] ("the Act"), directing de-

1.  22 U.S.C. § 618(f) (Supp.1972), amending 22 U.S.C. § 618 (1938). The section provides that:

"(f) Whenever in the judgment of the Attorney General any person is engaged in or about to engage in any acts which constitute or will constitute a violation of any provision of this subchapter, or regulations issued thereunder, or whenever any agent of a foreign principal fails to comply with any of the provisions of this subchapter or the reg-

fendant Irish Northern Aid Committee to produce its books and records for inspection by officials charged with the enforcement of the Act.

The meaningful facts are not in dispute. The defendant, an unincorporated association doing business in the Bronx, registered as an agent of a foreign principal on or about January 29, 1971 pursuant to § 2 of the Act.[2] A supplemental statement effective January 29, 1972 was filed on March 21.

One week later, on March 28, in a letter emanating from the Internal Security Division of the Department of Justice, defendant's attention was directed to shortcomings in that statement and its failure to comply with other Department information requests. Forms were enclosed where they existed and information concerning defendant's representation of the Provisional Irish Republican Army was specifically requested. The letter went on to say:

" . . . We have on numerous occasions advised you of your obligations under this section of the Act and we can only construe any further failures on your part to properly label and report any political propaganda disseminated by you as wilfull violations of the Act."

Frank Durkan, an attorney, replying on behalf of the Irish Northern Aid Committee on April 7, noted that when the defendant's relationship with the Provisional Irish Republican Army had been verified the information requested in the Department's letter of March 28 would be forthcoming. Responding to

the point raised by the Justice Department, Mr. Durkan wrote of the membership:

" . . . We have, however, impressed upon them the necessity of making every effort to live by and adhere to those rules, no matter how onerous they may be or how unreasonable they may seem. The undersigned has volunteered to help them henceforth."

Durkan's response ended with an offer to try "to assist in obtaining the information you seek" if the Department would thereafter contact him.

A schedule of remittances was mailed by defendant to the Department on or about April 14, from which it appeared that between August 5, 1971 and January 10, 1972, $128,099 had been raised and distributed, all but $7,399 of which was delivered to one Joseph Cahill. On May 15, a letter signed "A. William Olson, Acting Assistant Attorney General, Internal Security Division—By: Justin J. O'Shea, Chief, Registration Section" pointed out that information long outstanding had not been received and that the schedule of remittances of April 14 was "incomplete" in that it failed, among other things, to show the names of the contributors and the sums contributed. No further information was thereafter forthcoming from the defendant.

On June 23, 1972, Special Agent Paul Donahue of the Federal Bureau of Investigation delivered to Matthew Higgins, the person who had signed defendant's schedule of remittances, a notice

---

ulations issued thereunder, or otherwise is in violation of the subchapter, the Attorney General may make application to the appropriate United States district court for an order enjoining such acts or enjoining such person from continuing to act as an agent of such foreign principal, or for an order requiring compliance with any appropriate provision of the subchapter or regulation thereunder. The district court shall have jurisdiction and authority to issue a temporary or permanent injunction, restraining order or such other order

which it may deem proper. The proceedings shall be made a preferred cause and shall be expedited in every way."

2. 22 U.S.C. § 612. The section provides in relevant part that:
"(a) No person shall act as an agent of a foreign principal unless he has filed with the Attorney General a true and complete registration statement and supplements thereto as required by this section and subsection (b) of this section or unless he is exempt from registration under the provisions of this subchapter. . . . "

dated June 20, 1972 from Acting Assistant Attorney General Olson requiring that defendant's books and records be made available to Special Agents of the Federal Bureau of Investigation for inspection pursuant to § 5 of the Act.[3] Higgins said the books were not available but would be three days later. That day, June 26, Higgins told Special Agent Donahue that the books and records were not available and that the matter had been referred to the law firm of O'Dwyer and Bernstein (of which Durkan appears to be a member), as attorneys for the defendant.

On June 29, Donahue again contacted Higgins who, in his presence, telephoned Mr. Paul O'Dwyer. O'Dwyer asked that Donahue be put on. O'Dwyer stated that he was the defendant's attorney; that the notice of June 20 requiring the production of the defendant's books and records had been referred to him and that he had advised Higgins not to speak further with representatives of the Federal Bureau of Investigation. The phone was handed back to Higgins. After again speaking to O'Dwyer, Higgins said that after consulting with his attorney he was refusing to make the defendant's records available.

These facts, appearing from the affidavits and attached exhibits, are not in dispute. Thus, the defendant, an agent [4]

3. 22 U.S.C. § 615. Section 5 provides that:

"Every agent of a foreign principal registered under this subchapter shall keep and preserve while he is an agent of a foreign principal such books of account and other records with respect to all his activities, the disclosure of which is required under the provisions of this subchapter, in accordance with such business and accounting practices, as the Attorney General, having due regard for the national security and the public interest, may by regulation prescribe as necessary or appropriate for the enforcement of the provisions of this subchapter . . . ."

Rule 500 promulgated thereunder, 28 C.F.R. § 5.500, requires the registrant to keep the following records:

"(1) All correspondence, memoranda, cables, telegrams, teletype messages, and other written communications to and from all foreign principals and all other persons, relating to the registrant's activities on behalf of, or in the interest of any of his foreign principals.

(2) All correspondence, memoranda, cables, telegrams, teletype messages, and other written communications to and from all persons, other than foreign principals, relating to the registrant's political activity, or relating to political activity on the part of any of the registrant's foreign principals.

(3) Original copies of all written contracts between the registrant and any of his foreign principals.

(4) Records containing the names and addresses of persons to whom political propaganda has been transmitted.

(5) All bookkeeping and other financial records relating to the registrant's activities on behalf of any of his foreign principals, including cancelled checks, bank statements, and records of income and disbursements, showing names and addresses of all persons who paid moneys to or received moneys from, the registrant, the specific amounts so paid or received, and the date on which each item was paid or received.

(6) If the registrant is a corporation, partnership, association, or other combination of individuals, all minute books.

(7) Such books or records as will disclose the names and addresses of all employees and agents of the registrant, including persons no longer acting as such employees or agents.

(8) Such other books, records, and documents as are necessary properly to reflect the activities for which registration is required."

Rule 501, 28 C.F.R. § 5.501, authorizes officials of the Federal Bureau of Investigation to inspect the books and records listed in Rule 500.

4. § 1 of the Act, 22 U.S.C. § 611, provides that:

"(c) Except as provided in subsection (d) of this section, the term 'agent of a foreign principal' means—

(1) any person who acts as an agent, representative, employee, or servant, or any person who acts in any other capacity at the order, request, or under the direction or control, of a foreign principal or of a person any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign principal, and who directly or through any other person—

of a foreign principal[5] within the meaning of the Foreign Agents Registration Act,[6] has failed to fully comply with the registration requirements of § 2 of the Act. In addition, it has refused to allow its books and records to be examined pursuant to the provisions of § 5 of the Act and Rules 500 and 501 promulgated thereunder.[7] As a result, the Attorney General now seeks to compel the defendant to comply with its statutory obligations.

In opposing this application, defendant points out that, on June 12, 1972 subpoenas were served on four of its prominent members and eight others requiring their appearance at a Federal grand jury investigation in Fort Worth, Texas the following week. That grand jury is investigating possible violations of the Act, gun control acts, conspiracy laws and other Federal criminal statutes and it has not been disputed that its investigation, at least in part, involves the shipment of arms and/or funds to the Provisional Irish Republican Army. From this, the defendant argues that the Government is misusing the Act to aid the criminal investigation pending in Texas.

The only factual dispute then, arises from defendant's speculative assertion that the ". . . Texas action and the New York action are one and the same. The instant action is but another prong of the Texas grand jury investigation—an investigation admittedly involving potential *criminal prosecution.*" (Affidavit of Frank Durkan.) The Court cannot understand

---

(i) engages within the United States in political activities for or in the interests of such foreign principal;

(ii) acts within the United States as a public relations counsel, publicity agent, information-service employee or political consultant for or in the interests of such foreign principal;

(iii) within the United States solicits, collects, disburses, or dispenses contributions, loans, money, or other things of value for or in the interest of such foreign principal; or

(iv) within the United States represents the interests of such foreign principal before any agency or official of the Government of the United States; and

(2) any person who agrees, consents, assumes or purports to act as, or who is or holds himself out to be, whether or not pursuant to contractual relationship, an agent of a foreign principal as defined in clause (1) of this subsection.

(d) The term 'agent of a foreign principal' does not include any news or press service or association organized under the laws of the United States or of any State or other place subject to the jurisdiction of the United States, or any newspaper, magazine, periodical, or other publication for which there is on file with the United States Postal Service information in compliance with section 3611 of Title 39, published in the United States, solely by virtue of any bona fide news or journalistic activities, including the solicitation or acceptance of advertisements, subscriptions, or other compensation therefor, so long as it is at least 80 per centum beneficially owned by, and its officers and directors, if any, are citizens of the United States, and such news or press service or association, newspaper, magazine, periodical, or other publication, is not owned, directed, supervised, controlled, subsidized, or financed, and none of its policies are determined by any foreign principal defined in subsection (b) of this section, or by any agent of a foreign principal required to register under this subchapter".

5. § 1 further provides that:
   "(b) The term 'foreign principal' includes—
   (1) a government of a foreign country and a foreign political party;
   (2) a person outside of the United States, unless it is established that such person is an individual and a citizen of and domiciled within the United States, or that such person is not an individual and is organized under or created by the laws of the United States or of any State or other place subject to the jurisdiction of the United States and has its principal place of business within the United States; and
   (3) a partnership, association, corporation, organization, or other combination of persons organized under the laws of or having its principal place of business in a foreign country."

6. 22 U.S.C. § 611 et seq.

7. 28 C.F.R. §§ 5.500 and 5.501.

how this position can be seriously maintained in view of the fact that defendant was advised in writing as early as March 28 of its continuing failures to comply with the Act. Indeed, as we have seen, Durkan, as far back as April 7, was solemnly assuring the Department that there would be compliance and that he would help in obtaining it. What we have here is a case in which defendant has delayed, stalled and finally refused to provide information required by law.

The frivolity of this argument is demonstrated by the fact that if the Texas grand jury wants the documents requested here its subpoenas will speedily collect them and more.

Add to this the Government's supplemental affidavit, which quotes a conversation with Olson on July 5, 1972 in which he authorizes the following representations:

1. The Government's request to examine defendant's books and records was not for the purpose of submitting them to the grand jury in Texas.

2. The Government will not send defendant's books and records or copies to the grand jury.

■ Considering all these factors, the Court sees no necessity for a factual hearing. Cf. Ross-Whitney Corp. v. Smith, Kline & French Laboratories, 207 F.2d 190 (9th Cir. 1953); Walsh v. Local Board No. 10, Mt. Vernon, N. Y., 305 F.Supp. 1274 (S.D.N.Y.1969). It would appear just another tactic to forestall the day when facts reportable at least six months ago will have to be produced. It seems to the Court that this may well be an attempt to checkmate the Government's legal quest for information by requiring the presence for interrogation of high level Government officials engaged in one of the Nation's most sensitive security areas. It confronts them with the choice of submitting to the questions of the defendant or, in the alternative, of abdicating its statutory rights.

I do not decide that in no case will such a hearing be held. But surely Congress intended that its basis be something more than a whim or the desire to frustrate the orderly administration of Government business when it said in § 618(f) of the Act " . . . The proceedings shall be made a preferred cause and shall be expedited in every way."

The defendant also contends that the Act violates the First Amendment insofar as it requires lists of the defendant's members and contributors. It argues that the scope of the inspection is too broad and that disclosure of the books and records will result in reprisals against such members and contributors.

Two of its officers, claiming that items of their personal property are included in defendant's books and records, seek to intervene in this action pursuant to Rule 24(a) (2) of the Federal Rules of Civil Procedure in order to join in this constitutional objection.

The Government, on the other hand, contends that review of the defendant's books and records in order to ascertain defendant's true operations so that amended registration statements can be requested is necessary to discharge its responsibilities under the Act. Moreover, as we have seen, it has specifically represented that the defendant's books and records will not be sent to the Texas grand jury. With regard to the constitutional claim, the Government takes the position that the Act is fully compatible with the First Amendment.

I.

Defendant's arguments that the scope of the requested inspection is too broad and that provisions of the Act violate the First Amendment cannot be sustained. The first is a straw man. It relies upon the contention that the Government has no right to inspect the personal correspondence contained in the defendant's files. The second, contesting the Government's right to demand disclosure of the names of its members and

contributors, is founded on clearly distinguishable cases.

∎ First, the Government made perfectly clear at the argument that it is seeking inspection only of those books and records which are relevant to defendant's registration under the Act. It is not asking for the personal correspondence of defendant's officials, nor books and records concerning other activities, if any, conducted by defendant.

∎ Second, the Act does not specifically call for lists of members, but would require the names and addresses of those who paid or contributed money to the registrant, the amounts paid and the date of payment. In addition, it requires the names and addresses of all employees and agents of the registrant. To the extent that this information elicits membership information, defendant argues that the requested inspection abridges the First Amendment rights of its members and contributors and should be prohibited, citing NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) and its progeny.[8] There the Supreme Court held that the NAACP's membership lists were protected from disclosure by the First Amendment on a showing that disclosure would expose its members to economic reprisal, loss of employment, physical coercion, etc., and that the disclosure would have little or no bearing on the information the State was attempting to obtain. In short, the Court found no valid State purpose to balance against the abridgement of First Amendment rights.

∎ No such showing appears here. Unlike NAACP, supra, there is a strong governmental interest supporting the disclosure sought and, in such cases, the Court has required production. See Uphaus v. Wyman, 360 U.S. 72, 79 S.Ct. 1040, 3 L.Ed.2d 1090 (1959); Barenblatt v. United States, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959). This is a case in which a balance between individual and governmental interests must be struck as in all cases when First Amendment rights are asserted to bar governmental interrogations. Barenblatt, supra. Here the balance tilts strongly in favor of the Government.

∎ The purpose of the Act is to protect the interests of the United States by requiring complete public disclosure by persons acting for or in the interests of foreign principals where their activities are political in nature.[9] These disclosures offer the Government and our people the opportunity to be informed and therefore enable them to understand the purposes for which they act.

∎ The Act is founded upon the indisputable power of the Government to conduct its foreign relations and to provide for the national defense and so falls within the inherent regulatory power of the Congress. United States v. Peace Information Center, 97 F.Supp. 255 (D. D.C.1951). What is more fundamental then, than the authority to require every person acting as an "agent" of a foreign principal to file comprehensive information showing his agency activities. See Uphaus v. Wyman, supra; Barenblatt v. United States, supra; Wilkinson v. United States, 365 U.S. 399, 81 S.Ct. 567, 5 L.Ed.2d 633. Cf. Communist Party of United States v. Subversive Activities Control Board, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1960).[10]

8. See e. g. Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1962); Louisiana ex rel. Gremillion v. NAACP, 366 U.S. 293, 81 S.Ct. 1333, 6 L.Ed.2d 301 (1961); Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed. 2d 480 (1960).

9. See generally, U.S.Code Cong. & Adm. News p. 2397 (1966).

10. To the extent that Communist Party of United States v. Subversive Activities Control Board, supra has been limited by subsequent decisions, see e. g., Albertson v. Subversive Activities Control Board, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965), it has been because of Fifth Amendment considerations and not First Amendment considerations.

■ Whatever the factual infirmities discussed in the last cited case, it cannot be seriously argued that the sole or dominating purpose of the Act is to compel criminals to keep incriminating records to be used to convict the record-keepers in subsequent criminal trials. Its purpose is to meet the Government's need for records necessary to enforce its national defense and foreign policies.

And so, here disclosure of defendant's activities bears a substantial relation to a legitimate interest which is asserted by the Government to justify the disclosure. The governmental interest may fairly be said to outweigh any possible infringement of the First Amendment rights of the defendant's members or contributors.

■ The defendant engages in activities designed to promote the cause of one faction in the dispute currently raging in Northern Ireland. Its fund raising and propaganda activities may well be designed to influence American policy or, put most charitably, may result in serious complications for the Government in the conduct of its foreign affairs. In light of the magnitude of the public interests which the registration and disclosure provisions are designed to protect and the pertinence which registration and disclosure bear to the protection of those interests, I must reject the contention that the First Amendment prohibits the Attorney General from requiring the defendant to produce its books and records for inspection by the officials charged with enforcement of the Foreign Agents Registration Act.

## II.

■ In view of the above disposition, it is clear that the motion of John McCarthy and Michael Flannery to intervene as defendants must be denied. They seek to intervene in order to raise constitutional objections to the Government's inspection.

However, it is apparent that these individuals have no standing to participate in this action in their individual capacities for three reasons. First, the Government is not seeking to inspect any of their personal correspondence. It seeks only to inspect defendant's books and records in connection with its registration under the Act, and its activities for or on behalf of its foreign principal.

Second, the constitutional rights asserted by these individuals cannot be abridged by defendant's production of its books and records. For it is well established that "[T]he official records and documents of [an] organization that are held by [its officials] in a representative rather than in a personal capacity cannot be the subject of the personal privilege against self-incrimination . . . ." United States v. White, 322 U.S. 694, 699, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542 (1944).

Finally, the books and records requested here are required to be kept by § 5 of the Act. Consequently, they fall within the "required records" doctrine, and are not subject to a claim of privilege. Shapiro v. United States, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948); United States v. Kaufman, 429 F.2d 240 (2d Cir. 1970), cert. denied 400 U.S. 925, 91 S.Ct. 185, 27 L.Ed.2d 184 (1970).

The above constitute my findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

Accordingly, a preliminary injunction will issue. The Court directs that the defendant comply with the provisions of the Act and produce its books and records for inspection by officials charged with enforcement of the Act, including agents of the Federal Bureau of Investigation.

So ordered.

Since the purpose of the Act is not to compel criminals to keep incriminating records, cases such as *Albertson* are totally inapposite.