ATTORNEY GENERAL OF the UNITED STATES of America, Plaintiff,

v.

IRISH NORTHERN AID COMMITTEE, 273 East 194th Street, Bronx, New York 10458, Defendant.

No. 77 Civ. 708–CSH.

United States District Court, S. D. New York.

April 30, 1981.

John S. Martin, Jr., U. S. Atty., S. D. New York, New York City, for plaintiff; Peter C. Salerno, Asst. U. S. Atty., New York City, Brian K. Ahearn, Joanna Knowles, Dept. of Justice, Washington, D. C., of counsel.

O'Dwyer & Bernstien, for defendant; New York City, Frank Durkan, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff, the Attorney General of the United States, brings this action to enjoin defendant Irish Northern Aid Committee ("INAC") from violating the provisions of the Foreign Agents Registration Act of 1938, as amended (the "Act"), 22 U.S.C. § 611 *et seq.*, and its accompanying regulations, 28 C.F.R. § 5.1–.801. The Court has jurisdiction to issue permanent injunctive relief pursuant to 28 U.S.C. § 1345 and 22 U.S.C. § 618(f). The case is now before the Court on plaintiff's motion for summary judgment dismissing defendant's counterclaims and granting the relief sought in the complaint. Defendant opposes the motion and cross-moves for an order striking certain sections of an affidavit submitted in support of plaintiff's motion.

## I.

■ The general purpose of the Act is to protect the security and foreign relations of this country by requiring agents of foreign principals to identify themselves and disclose their activities. "Resting on the fundamental constitutional principle that our people, adequately informed, may be trusted to distinguish between the true and false, the [Act] is intended to label information of foreign origin so that hearers and readers may not be deceived by the belief that the information comes from a disinterested source." *Viereck v. United States*, 318 U.S. 236, 251, 63 S.Ct. 561, 568, 87 L.Ed. 734 (Black, J., dissenting). To accomplish these goals, the Act and the regulations promulgated thereunder specify in some detail who must register, the type and form of

information that must be revealed, and the frequency with which supplemental registration statements must be filed. The Act vests initial responsibility for enforcing the Act in the Attorney General:

"Whenever in the judgment of the Attorney General any person is engaged in or about to engage in any acts which constitute or will constitute a violation of any provision of this subchapter, or regulations issued thereunder, or whenever any agent of a foreign principal fails to comply with any of the provisions of this subchapter or the regulations issued thereunder, or otherwise is in violation of the subchapter, the Attorney General may make application to the appropriate United States district court for an order enjoining such acts or enjoining such person from continuing to act as an agent of such foreign principal, or for an order requiring compliance with any appropriate provision of the subchapter or regulation thereunder. The district court shall have jurisdiction and authority to issue a temporary or permanent injunction, restraining order or such other order which it may deem proper. The proceedings shall be made a preferred cause and shall be expedited in every way."

22 U.S.C. § 618(f). In addition to these civil remedies, willful violation of any provision of the Act is a criminal offense. *Id.* § 618(a).

In accordance with the terms of the Act, INAC, an unincorporated association with main offices in the Bronx, first registered as an agent of a foreign principal in 1971. In its original registration statement, INAC described itself as "a voluntary group who collect what money and clothing we can and send it on for use by the oppressed people" of Northern Ireland, Jan. 1981 Statement, Exhibit B, ¶ 4, and listed as its foreign principal the Northern Aid Committee, Belfast, Ireland. In addition, INAC's three "United States Representatives," the apparent equivalents of officers or directors, Messrs. Michael Flannery, John McCarthy,

and John McGowan,[1] filed the required short-form registration statements.

While defendant has at least partially complied with the various requirements of the Act by filing required semi-annual reports, plaintiff complains that defendant has not filed the supplemental information, statements and documents necessary to make its registration statement and subsequent reports true and complete. Specifically, the amended compluint[2] alleges various violations by defendant of 22 U.S.C. § 612(a),[3] to wit, that defendant has failed

1. Mr. McGowan died in May 1974 and his position was filled by Matthew Higgins in September 1974. Mr. Higgins, in turn, left INAC in March 1979, and John McElhone replaced him as INAC's third U. S. Representative.

2. The original complaint was filed on February 14, 1977. By Endorsement dated January 2, 1980, leave to file an amended complaint was granted. Unless otherwise specified, all future references to the "complaint" and "answer" are to the amended complaint and amended answer.

3. 22 U.S.C. § 612(a) provides:
"No person shall act as an agent of a foreign principal unless he has filed with the Attorney General a true and complete registration statement and supplements thereto as required by subsections (a) and (b) of this section or unless he is exempt from registration under the provisions of this subchapter. Except as hereinafter provided, every person who becomes an agent of a foreign principal shall, within ten days thereafter, file with the Attorney General, in duplicate, a registration statement, under oath on a form prescribed by the Attorney General. The obligation of an agent of a foreign principal to file a registration statement shall, after the tenth day of his becoming such agent, continue from day to day, and termination of such status shall not relieve such agent from his obligation to file a registration statement for the period during which he was an agent of a foreign principal. The registration statement shall include the following, which shall be regarded as material for the purposes of this subchapter:
"(1) Registrant's name, principal business address, and all other business addresses in the United States or elsewhere, and all residence addresses, if any;
"(2) Status of the registrant; if an individual, nationality; if a partnership, name, residence addresses, and nationality of each partner and a true and complete copy of its articles of copartnership; if an association, corporation, organization, or any other combination of individuals, the name, residence addresses, and nationality of each director and officer and of each person performing the functions of a director or officer and a true and complete copy of its charter, articles of incorporation, association, constitution, and bylaws, and amendments thereto; a copy of every other instrument or document and a statement of the terms and conditions of every oral agreement relating to its organization, powers, and purposes; and a statement of its ownership and control;
"(3) A comprehensive statement of the nature of registrant's business; a complete list of registrant's employees and a statement of the nature of the work of each; the name and address of every foreign principal for whom the registrant is acting, assuming or purporting to act or has agreed to act; the character of the business or other activities of every such foreign principal, and, if any such foreign principal be other than a natural person, a statement of the ownership and control of each; and the extent, if any, to which each such foreign principal is supervised, directed, owned, controlled, financed, or subsidized, in whole or in part, by any government of a foreign country or foreign political party, or by any other foreign principal;
"(4) Copies of each written agreement and the terms and conditions of each oral agreement, including all modifications of such agreements, or, where no contract exists, a full statement of all the circumstances, by reason of which the registrant is an agent of a foreign principal; a comprehensive statement of the nature and method of performance of each such contract, and of the existing and proposed activity or activities engaged in or to be engaged in by the registrant as agent of a foreign principal for each such foreign principal, including a detailed statement of any such activity which is a political activity;
"(5) The nature and amount of contributions, income, money, or thing of value, if any, that the registrant has received within the preceding sixty days from each such foreign principal, either as compensation or for disbursement or otherwise, and the form and time of each such payment and from whom received;
"(6) A detailed statement of every activity which the registrant is performing or is assuming or purporting or has agreed to perform for himself or any other person other than a foreign principal and which requires his registration hereunder, including a detailed statement or any such activity which is a political activity;
"(7) The name, business, and residence addresses, and if an individual, the nationality, of any person other than a foreign principal for whom the registrant is acting, assuming

to identify as a foreign principal the Irish Republican Army, Provisional Wing ("IRA") (¶ 7); that defendant has not fully identified its officers, employees, affiliates, branches, and other persons or groups acting for or in concert with it (¶ 8(a)); that defendant has not given the true and complete address of the Northern Aid Committee, its disclosed foreign principal (¶ 8(b)); that defendant has not described in detail its activities on behalf of a foreign principal

(¶ 8(c)); that defendant has not provided an accurate accounting of its receipts and disbursements, including the source or recipient, as well as the amounts, purpose and time (¶¶ 8(d)(e)); and that defendant has not filed accurate and complete statements regarding the preparation and dissemination of political propaganda, as that term is defined in § 1 of the Act (¶ 8(f)). The amended complaint further charges violations of 22 U.S.C. § 614,[4] in that defendant

or purporting to act or has agreed to act under such circumstances as require his registration hereunder; the extent to which each such person is supervised, directed, owned, controlled, financed, or subsidized, in whole or in part, by any government of a foreign country or foreign political party or by any other foreign principal; and the nature and amount of contributions, income, money, or thing of value, if any, that the registrant has received during the preceding sixty days from each such person in connection with any of the activities referred to in clause (6) of this subsection, either as compensation or for disbursement or otherwise, and form and time of each such payment and from whom received;

"(8) A detailed statement of the money and other things of value spent or disposed of by the registrant during the preceding sixty days in furtherance of or in connection with activities which require his registration hereunder and which have been undertaken by him either as an agent of a foreign principal or for himself or any other person or in conection [sic] with any activities relating to his becoming an agent of such principal, and a detailed statement of any contributions of money or other things of value made by him during the preceding sixty days (other than contributions the making of which is prohibited under the terms of section 613 of Title 18) in connection with an election to any political office or in connection with any primary election, convention, or caucus held to select candidates for any political office;

"(9) Copies of each written agreement and the terms and conditions of each oral agreement, including all modifications of such agreements, or, where no contract exists, a full statement of all the circumstances, by reason of which the registrant is performing or assuming or purporting or has agreed to perform for himself or for a foreign principal or for any person other than a foreign principal any activities which require his registration hereunder;

"(10) Such other statements, information, or documents pertinent to the purposes of this subchapter as the Attorney General, having due regard for the national security and

the public interest, may from time to time require;

"(11) Such further statements and such further copies of documents as are necessary to make the statements made in the registration statement and supplements thereto, and the copies of documents furnished therewith, not misleading."

4. 22 U.S.C. § 614 provides in pertinent part:

"(a) Every person within the United States who is an agent of a foreign principal and required to register under the provisions of this subchapter and who transmits or causes to be transmitted in the United States mails or by any means or instrumentality of interstate or foreign commerce any political propaganda for or in the interests of such foreign principal (i) in the form of prints, or (ii) in any other form which is reasonably adapted to being, or which he believes will be, or which he intends to be, disseminated or circulated among two or more persons shall, not later than forty-eight hours after the beginning of the transmittal thereof, file with the Attorney General two copies thereof and a statement, duly signed by or on behalf of such agent, setting forth full information as to the places, times, and extent of such transmittal.

"(b) It shall be unlawful for any person within the United States who is an agent of a foreign principal and required to register under the provisions of this subchapter to transmit or cause to be transmitted in the United States mails or by any means or instrumentality of interstate or foreign commerce any political propaganda for or in the interests of such foreign principal (i) in the form of prints, or (ii) in any other form which is reasonably adapted to being, or which he believes will be or which he intends to be, disseminated or circulated among two or more persons, unless such political propaganda is conspicuously marked at its beginning with, or prefaced or accompanied by, a true and accurate statement, in the language or languages used in such political propaganda, setting forth the relationship or connection between the person transmitting the po-

has disseminated written material containing political propaganda without first filing the statutorily mandated two copies as well as a signed statement setting forth the time, place and extent of the proposed dissemination; and has failed to label the material as required by § 614(b) (¶¶ 10, 11). The Attorney General prays for injunctive relief compelling compliance, both with respect to future conduct and to past statements, insofar as they can be amended.

Defendant, in its amended answer, denies all allegations of the complaint, except that it admits that it is an "unincorporated committee" in the Bronx, and that on or about January 29, 1971 it complied with the directives of the Attorney General and registered as an agent of a foreign principal, thereafter filing semi-annual registration statements. In respect of these actions,

defendant alleges that it did so "under duress," and "following a course of unabated harassment on the part of the plaintiff." In a series of affirmative defenses, the defendant alleges harassment and victimization by various illegal Government activities; that the Act is unconstitutional on its face and as applied to INAC; that the action is barred by laches; that the action results from illegal electronic surveillance; that defendant is exempt from the requirements of the act pursuant to 22 U.S.C. § 613(d)(3);[5] that the complaint fails to state a claim; and that the instant prosecution constitutes selective enforcement directed at defendant because of hostility to its beliefs and activities.

In addition, INAC asserts four counterclaims "on behalf of defendant Irish Northern Aid and its representatives." The first

litical propaganda or causing it to be transmitted and such propaganda; that the person transmitting such political propaganda or causing it to be transmitted is registered under this subchapter with the Department of Justice, Washington, District of Columbia, as an agent of a foreign principal, together with the name and address of such agent of a foreign principal and of such foreign principal; that, as required by this subchapter, his registration statement is available for inspection at and copies of such political propaganda are being filed with the Department of Justice; and that registration of agents of foreign principals required by the subchapter does not indicate approval by the United States Government of the contents of their political propaganda. The Attorney General, having due regard for the national security and the public interest, may by regulation prescribe the language or languages and the manner and form in which such statement shall be made and require the inclusion of such other information contained in the registration statement identifying such agent of a foreign principal and such political propaganda and its sources as may be appropriate.

\* \* \* \* \* \*

"(e) It shall be unlawful for any person within the United States who is an agent of a foreign principal required to register under the provisions of this subchapter to transmit, convey, or otherwise furnish to any agency or official of the Government (including a Member or committee of either House of Congress) for or in the interests of such foreign principal any political propaganda or to request from any such agency or official for or in the interests of such foreign principal any information or advice with respect to any

matter pertaining to the political or public interests, policies or relations of a foreign country or of a political party or pertaining to the foreign or domestic policies of the United States unless the propaganda or the request is prefaced or accompanied by a true and accurate statement to the effect that such person is registered as an agent of such foreign principal under this subchapter.

"(f) Whenever any agent of a foreign principal required to register under this subchapter appears before any committee of Congress to testify for or in the interests of such foreign principal, he shall, at the time of such appearance, furnish the committee with a copy of his most recent registration statement filed with the Department of Justice as an agent of such foreign principal for inclusion in the records of the committee as part of his testimony."

5. 22 U.S.C. § 613(d) exempts from the requirements of § 612(a):

"(d) Any person engaging or agreeing to engage only (1) in private and nonpolitical activities in furtherance of the bona fide trade or commerce of such foreign principal; or (2) in other activities not serving predominantly a foreign interest; or (3) in the soliciting or collecting of funds and contributions within the United States to be used only for medical aid and assistance, or for food and clothing to relieve human suffering, if such solicitation or collection of funds and contributions is in accordance with and subject to the provisions of subchapter II of chapter 9 of this title, and such rules and regulations as may be prescribed thereunder; . . . "

counterclaim alleges violations of constitutional rights by means of burglaries, illegal searches and seizures, and warrantless electronic surveillance. The second seeks damages for wiretapping. The third counterclaim alleges a cause of action under the Privacy Act of 1974, 5 U.S.C. § 552a, and claims damages for violation of that statute. The fourth counterclaim realleges the foregoing acts, and further alleges that "Defendant and its Representatives will suffer irreparable harm to their constitutional rights by virtue of such conduct." Defendant's prayer is for damages, declaratory judgment, and injunctive relief, in respect of the various causes of action set forth in the counterclaims.

In support of the instant motion, plaintiff has submitted the registration statements prepared and filed by defendant between January 1971 and January 1980; plaintiff's responses to defendant's first set of interrogatories and document requests; defend-

ant's responses to plaintiff's interrogatories; affidavits sworn to by Matthew Higgins, John McCarthy, and Michael Flannery, officers and representatives of defendant, in which, *inter alia*, each invokes the fifth amendment privilege against self-incrimination to support his refusal to answer certain interrogatories propounded by plaintiff; [6] and an affidavit sworn to by Brian K. Ahearn on April 30, 1976 ("Ahearn affidavit"). Since August 1971, Ahearn, an attorney with the Registration Unit, Internal Security Section, Criminal Division of the Department of Justice, has been primarily responsible for and personally familiar with defendant's registration under the Act. *Id.* ¶ 2. Ahearn avers that he has personally reviewed defendant's registration statements, as well as the thousands of pages of business and financial records produced by defendant pursuant to F.R.Civ.P. 34,[7] *id.* ¶ 3, and that, in his judgment,

---

**6.** By motion brought before the Honorable Kent Sinclair, Jr., United States Magistrate, who was supervising all pretrial discovery in this action, plaintiff sought to compel answers to its interrogatories. Defendant opposed the motion, claiming that the three persons named in the text were the only persons possessed with the knowledge required to answer the interrogatories, and that, if any of them were required to respond, each would have to incriminate himself. In an Opinion and Order dated February 23, 1979, Magistrate Sinclair upheld the defendant's claim of fifth amendment privilege and directed each of the three representatives to submit affidavits stating whether they could, consistent with the fifth amendment, answer any of the interrogatories; state whether there was anyone else with the requisite knowledge; or state the names of defendant's supporting staff. The affidavits referred to in the text were prepared in conformity with the Magistrate's Order.

**7.** Ahearn's authority to inspect defendant's books and records derives in part from 22 U.S.C. § 618(f), and 28 C.F.R. § 5.501, which provides:

"Officials of the Criminal Division and the Federal Bureau of Investigation are authorized under section 5 of the Act to inspect the books and records listed in § 5.500(a)."

28 C.F.R. § 5.500(a) in turn provides:

"A registrant shall keep and preserve in accordance with the provisions of section 5 of the Act the following books and records:

"(1) All correspondence, memoranda, cables, telegrams, teletype messages, and other writ-

ten communications to and from all foreign principals and all other persons, relating to the registrant's activities on behalf of, or in the interest of any of his foreign principals.

"(2) All correspondence, memoranda, cables, telegrams, teletype messages, and other written communications to and from all persons, other than foreign principals, relating to the registrant's political activity, or relating to political activity on the part of any of the registrant's foreign principals.

"(3) Original copies of all written contracts between the registrant and any of his foreign principals.

"(4) Records containing the names and addresses of persons to whom political propaganda has been transmitted.

"(5) All bookkeeping and other financial records relating to the registrant's activities on behalf of any of his foreign principals, including canceled checks, bank statements, and records of income and disbursements, showing names and addresses of all persons who paid moneys to, or received moneys from, the registrant, the specific amounts so paid or received, and the date on which each item was paid or received.

"(6) If the registrant is a corporation, partnership, association, or other combination of individuals, all minute books.

"(7) Such books or records as will disclose the names and addresses of all employees and agents of the registrant, including persons no longer acting as such employees or agents.

"[d]efendant has failed to comply with the disclosure and labelling requirements of the Act." *Id.* ¶ 4; *see* § 618(f), set forth in full *ante.*

The Ahearn affidavit specifies numerous perceived inadequacies in defendant's original and supplemental registration statements. For example, no street address is given by defendant for its disclosed foreign principal, the Northern Aid Committee, despite its location in a major European city. Consequently, the Attorney General has been frustrated in its attempts to verify the existence of the Northern Aid Committee, a problem compounded by the absence in the files delivered to plaintiff during discovery of any correspondence between INAC and the Northern Aid Committee. Moreover, Ahearn avers that:

"To the extent that the Defendant's financial records show to whom funds were delivered none of the in excess of one million dollars raised by the Defendant appears to have gone to the Committee. Indeed it is impossible to ascertain from the records where most of the money has gone or even if it has left the country."

*Id.* ¶ 6. In this connection, Ahearn cites the portions of the registration statements in which defendant has not listed the sources or recipients of, respectively, receipts or disbursements, and his own calculations which reveal discrepancies in defendant's financial statements. As an additional example of defendant's noncompliance with the Act, Ahearn refers to numerous documents produced during discovery, including letters written by and to defendant's representatives, to support his contention that defendant's true foreign principal is the IRA. If this allegation is true, defendant would clearly be in violation of the Act because it has failed to mention the IRA in its registration statements or on the labels required to be affixed to political propaganda. Ahearn further directs the Court's attention to numerous blank or inconsistent answers in the registration statements, including those relating to defendant's activities on behalf of its foreign principal. In plaintiff's view, the most obvious undisclosed activity is defendant's alleged operation and control of *The Irish People* newspaper. Ahearn further cites various written material, characterized by him as political propaganda, which is unaccompanied by the proper labelling or dissemination reports. The affidavit is replete with other instances of defendant's alleged violations of the Act too numerous to mention here, and Ahearn appends voluminous documents to support each example.

With respect to defendant's affirmative defenses and counterclaims, plaintiff claims that defendant has come forth with no evidentiary proof for its assertions to counter plaintiff's averments that there has been no illegal conduct on the part of the Government; that defendant's allegations are deficient as a matter of law; and with respect to the counterclaims, that they are suits against the United States Treasury barred by principles of sovereign immunity.

In the Attorney General's view, the foregoing entitles him to judgment in his favor on the complaint and counterclaims as a matter of law. F.R.Civ.P. 56.

Defendant's position is that plaintiff has not established a prima facie case and, accordingly, defendant has done little to rebut the merits of the charges contained in the complaint and Ahearn affidavit. The thrust of defendant's argument is a challenge to the admissibility and legal sufficiency of the Ahearn affidavit and accompanying exhibits, an attack accomplished in defendant's supporting affidavit through an almost line-by-line analysis of the Ahearn affidavit. Affidavit of Frank Durkan, a Member of the Firm of O'Dwyer & Bernstien, Attorneys for Defendant, sworn to June 11, 1980 ("Durkan affidavit"). Durkan asserts that the Ahearn affidavit and

"(8) Such other books, records, and documents as are necessary properly to reflect the activities for which registration is required." For a thorough discussion on the power of the Attorney General to inspect a registrant's books and records, see *Attorney General v. INAC,* 346 F.Supp. 1384 (S.D.N.Y.), *aff'd without opinion,* 465 F.2d 1405 (2d Cir.), *cert. denied,* 409 U.S. 1080, 93 S.Ct. 679, 34 L.Ed.2d 669 (1972).

exhibits thereto are filled with opinion, innuendo and inadmissible hearsay, and thus not cognizable pursuant to F.R.Civ.P. 56(e) on a motion for summary judgment.

Insofar as defendant assumes the admissibility of the documents submitted by plaintiff and addresses the merits of plaintiff's arguments, defendant argues that the materials are ambiguous and may lead the trier of fact to draw conclusions different from those drawn by plaintiff. For example, Durkan denies that defendant is an agent of the IRA, and contends that plaintiff's proof requires "distinctions to be drawn between acting as an agent as opposed to a citizen's constitutionally protected expression of political beliefs and sympathies, [and] is subject to conflicting interpretations." Durkan affidavit, ¶ 11. Similarly, defendant challenges the assertion that it manages and controls *The Irish People* newspaper, stating that plaintiff's allegation is based not on defendant's business records, but on "letters [produced by defendant] containing no more than intra-mural gossip and speculations among members of the defendant's various chapters." *Id.* ¶ 20. Durkan opposes in the same manner the remaining allegations and proof thereof, including those relating to alleged political propaganda and inadequacies in the financial statements. With respect to the affirmative defenses and counterclaims, defendant argues that plaintiff's "pro-forma denial of unlawful surveillance of the defendant is wholly inadequate under applicable law," [8] and that its claim of selective enforcement is supported by Exhibit A to the Durkan affidavit, a document relating to INAC prepared by the Federal Bureau of Investigation. Defendant has submitted no other exhibits or affidavits to support either the affirmative defenses or the counterclaims.

On the basis of the foregoing, defendant argues that there are material issues of genuine fact precluding summary judgment. That the issues raised by the complaint and answer are not conceded is obvious and, in this sense, there are disputed issues of fact. That they are dispositive issues whose resolution requires the Court to sift through the record is equally clear. Neither of these considerations, however, are sufficient to defeat summary judgment.

## II.

In deciding a motion for summary judgment, it is not a court's function to "try issues of fact: it can only determine whether there are issues to be tried," *American Manufacturers Mut. Ins. Co. v. American Broadcasting-Paramount Theatres, Inc.,* 388 F.2d 272, 279 (2d Cir. 1967); *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir. 1978); *see Babdo Sales, Inc. v. Miller-Wohl Co.,* 440 F.2d 962, 965 (2d Cir. 1971). Because summary judgment is a "harsh remedy," *Flli Moretti Cereali v. Continental Grain Co.,* 563 F.2d 563, 565 (2d Cir. 1977), the court in reviewing the record must "take that view of the evidence most favorable to the opponent of the moving party." *Empire Electronics Co. v. United States,* 311 F.2d 175, 180 (2d Cir. 1962). Furthermore, the movant bears the burden of proving the absence of material questions of fact. *Kinney Shoe Corp. v. Alitalia Airlines,* 79 Civ. 919(CSH) (S.D.N.Y.1980), slip op. at 5 (citing *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir. 1975)).

But, as this Court noted in *Kinney, supra:* "summary judgment is also a premiere 'procedural device[] capable of terminating litigation quickly, efficiently, and fairly . . .' *S.E.C. v. Research Automation Corp.,* 585 F.2d 31, 32 (2d Cir. 1978). Then Chief Judge Kaufman's opinion for the *Research Automation* panel was intended 'primarily to illustrate the effective use of summary judgment in the appropriate case.' *Id.* The decision teaches that when a summary judgment motion is documented as Rule 56(c) requires:

'. . . an adverse party may not rest upon mere conclusory allegations or denials. The party opposing the motion

---

**8.** Brief in Opposition, at 7.

must set forth "concrete particulars," *Dressler v. The MV Sandpiper*, 331 F.2d 130, 133 (2d Cir. 1964), and cannot make a secret of his evidence, holding it close to his chest until the trial. *See Donnelly v. Guion*, 467 F.2d 290, 291 (2d Cir. 1972). It is not sufficient merely to assert a conclusion without supplying supporting arguments or facts in opposition to the motion. *Id.* at 293. *See Applegate v. Top Associates, Inc.*, 425 F.2d 92, 96 (2d Cir. 1970).'

'. . . [T]he policy favoring efficient resolution of disputes, which is the cornerstone of the summary judgment procedure, would be completely undermined if unsubstantiated assertions were sufficient to compel a trial. Accordingly, even in suits for injunctive relief, the district courts should not hesitate to grant a plaintiff's request for summary judgment when the defendant has failed to meet the requirements prescribed by Rule 56(e).' *Id.* at 33–34."

Slip op. at 5–6.

■ Three separate inquiries are mandated by the *Research Automation* case. The initial question is whether the motion is supported by the documents listed in Rule 56(c): the pleadings, depositions, answers to interrogatories, admissions, and affidavits. In this connection, Rule 56(e) requires that "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Second, the court must pierce the opposition papers to determine whether they set forth facts rather than unsubstantiated assertions; a refusal to concede a point does not necessarily mean that the issue is disputed as that term is used in the context of summary judgment. Finally, if the Court determines there are no triable issues of fact, it must then determine whether the movant is entitled to judgment as a matter of law on the undisputed record. Rule 56(c). I address these questions in turn.

## III.

With respect to the first inquiry—whether plaintiff has satisfied Rule 56(c) and (e)—I conclude that the Ahearn affidavit is based on personal knowledge. As noted above, Ahearn has been actively supervising defendant's compliance since 1971 and has personally reviewed all of the defendant's documents produced during discovery. For the most part he has set forth facts readily perceivable from an examination of the registration statements and other exhibits appended to his affidavit. Insofar as those exhibits constitute inadmissible hearsay, or Ahearn's conclusory interpretations of exhibits, I have disregarded his statements, as I must. *Chi-Mil Corp. v. W. T. Grant Co.*, 70 F.R.D. 352, 358 (E.D.Wis.1976).

Defendant asserts a wholesale challenge to those exhibits comprised of letters to and from INAC, publicity notices, advertisements, and the like, claiming that they are hearsay and therefore not permitted to be used on a motion for summary judgment. F.R.Civ.P. 56(e); F.R.E. 801–805. Of course, because the exhibits are reproductions of documents obtained from defendant's files, their authenticity cannot be seriously disputed. *See* F.R.E. 901. However, merely because authenticity is not a bar to admissibility does not mean that the documents cannot be excluded on some other ground, namely, hearsay.

■ With respect to the correspondence included in the file, those papers written on INAC's letterhead, those signed by INAC's representatives, and those that are unsigned but clearly emanating from the INAC office, are not hearsay. Under F.R.E. 801(d)(2), they constitute admissions by defendant. The same conclusion applies to statements in letters written to INAC, that were specifically adopted or incorporated by reference in INAC's reply. F.R.E. 801(d)(2)(B). The remaining correspondence included as exhibits constitutes hearsay insofar as it is offered as proof of its contents, notwithstanding defendant's implied concession that it was received from

affiliated individuals and organizations.[9] Affiliation, without more, does not make a person an agent of a party to a lawsuit for purposes of F.R.E. 801(d)(2)(C), (D), and (E). To the extent that the correspondence *to* INAC is necessary to understand the correspondence *from* INAC, however, the former may be used by the Court for this limited purpose. That is because, in such a case, the letters to INAC are not being offered to prove the truth of the matter asserted and therefore do not constitute hearsay. F.R.E. 801(c). A similar rationale supports the admissibility of the advertisements and other releases; they are being offered by plaintiff not to prove their contents, but to demonstrate that they constitute political propaganda as defined by the Act.

■ Having narrowed plaintiff's proof accordingly, the conclusion remains inescapable that he has supported his motion with an uncontroverted factual affidavit and exhibits, together with the answers to interrogatories. He has made a prima facie showing that defendant has violated the Act in numerous respects, each of which will be dealt with individually.

I turn first, however, to the affirmative defenses, which, if meritorious, would be dispositive.

## IV.

■ The facial validity of the Act has previously been upheld against first amendment challenge. *Attorney General v. INAC*, 346 F.Supp. 1384 (S.D.N.Y.), *aff'd without opinion*, 465 F.2d 1405 (2d Cir.), *cert. denied*, 409 U.S. 1080, 93 S.Ct. 679, 34 L.Ed.2d 659 (1972); *United States v. Peace Information Center*, 97 F.Supp. 255 (D.D.C. 1951); *see Viereck v. United States*, 318 U.S. 236, 251, 63 S.Ct. 561, 568, 87 L.Ed. 734 (1943) (Black, J., dissenting). Defendant argues, however, that as applied to it the Act violates its first amendment rights. In-

sofar as that claim stands without explanation, the application of the Act to this defendant does not differ in any significant way from the prosecution in *Peace Information Center, supra*, nor from that in *Attorney General v. INAC*, in which the court rejected INAC's first amendment claim.

Nor does this conclusion change when the constitutional claim is read in conjunction with defendant's allegation that it was unlawfully singled out for prosecution under the Act because of hostility to its beliefs, and in "an attempt to impede and deter defendant ... from freely exercising [its] First Amendment rights." Amended answer, ¶ 23. In support of this affirmative defense, defendant submitted a document drafted by the FBI in September 1973, which reads in pertinent part:

"The Irish situation has become a serious problem and source of embarrassment to the U. S. The State Department is continuing to receive pressure from the GOI and State is seeking assistance to alleviate the U. S. problem; however, it is apparent that State is not aware of the investigative responsibilities of the various U. S. agencies and has turned to the FBI for assistance in alleviating this problem. Our primary investigative effort in this regard is in connection with the Foreign Agents Registration Act of 1938, as amended and we have no investigative jurisdiction with regard to the purchase of weapons and explosives or the use of the mails for soliciting contributions. It is felt that the assistance being sought by State is a task not only for the FBI, but other investigative agencies such as Customs, Bureau of Alcohol, Tobacco and Firearms, INS, CIA, etc. "*Recommendation*:

"In order to assist State and to brief State on the responsibilities of the various investigative agencies, as well as to coordinate the efforts of these agencies in alleviating the Irish problem in the U. S.,

9. *See* Letter of April 11, 1979 from Mark G. Barrett of O'Dwyer & Bernstien, counsel for defendant, Exhibit A to Declaration of Peter C. Salerno, Asst. U. S. Attorney, executed July 17, 1980 ("In regard to the material that was pro-

duced [by INAC], please be advised that the following material was withheld: ... 3. Correspondence from unaffiliated individuals and organizations to the defendant....").

it is recommended that representatives from CI-3 contact the Department with regard to State's inquiry and suggest to the Department that they might desire to consider convening a conference consisting of representatives of the appropriate U. S. Government agencies.

"It is anticipated that the Department will review the responsibilities of each agency involved in the investigation of militant Irish activities in the U. S. and act as coordinator of those and U. S. efforts to prosecute those responsible for violations of U. S. statutes. It is also anticipated that State, which would attend this conference, would have an opportunity to explain its interest in detail to those in attendance and at the same time would understand the responsibilities of each interested U. S. agency in the problem."

In defendant's view, the foregoing by itself substantiates its assertion that it has been prosecuted selectively; it has neither submitted additional evidence nor requested further discovery on the issue. Plaintiff, on the other hand, contends that defendant has not shown the purposeful discrimination necessary to sustain the defense.

 Selectivity alone does not render prosecution unlawful, *Oyler v. Boles*, 368 U.S. 448, 455–56, 82 S.Ct. 501, 505–06, 7 L.Ed.2d 446 (1962); *Moss v. Hornig*, 314 F.2d 89 (2d Cir. 1963); rather, to be unlawful, the decision to prosecute must be predicated on some unjustifiable standard. *Oyler, supra*, 368 U.S. at 456, 82 S.Ct. at 506; *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *United States v. Steele*, 461 F.2d 1148, 1151 (9th Cir. 1972) (prosecution unlawful if it is an act of discrimination against those who exercise their First Amendment rights). The party raising the defense of selective prosecution "bears the heavy burden of establishing, at least *prima facie*, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's

discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights." *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974). If the defendant establishes a *prima facie* case, the burden shifts to the government to prove that the prosecution did not arise from discriminatory motives. *Id.* at 1212 n.4 and cases cited therein.

 In the case at bar, defendant simply has not met its burden of proof. Defendant has not shown that the prosecution is "invidious or in bad faith." In fact, the quoted memo, although it refers to the "Irish problem," makes clear that the purpose of the proposed conference was to discuss prosecution of those who violate federal statutes. Even assuming that defendant has satisfied this prong of the *Berrios* test, it has pointed to no instances in which others allegedly in violation of the Act have not been prosecuted. The absence of such proof, by itself, defeats the defense. *See id.* at 1211–12. *Compare Attorney General v. The Irish People, Inc.*, 502 F.Supp. 63 (D.D. C.1980).

 Defendant's remaining defenses appear to have been abandoned on this motion and, in any event, fail for lack of any factual or legal bases whatsoever. *See* Part II *ante*. With respect to the defense of harassment and duress, defendant has cited not one instance to support that claim; in any event, defendant, an admitted agent of a foreign principal, has a statutorily mandated duty to comply with the Act regardless of government action. As to the defense of laches, defendant has not pleaded or proved an essential element: that the delay in prosecution has resulted in its prejudice. Even if the defense possesses some undisclosed merit, it cannot be raised in a civil enforcement action brought by the government. *See Utah Power & Light Co. v. United States*, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917). With respect to defendant's claim that it is a relief organization and thus exempt from the Act pursu-

ant to 22 U.S.C. § 613(d)(3), it is important to note that defendant bears the burden of proof on this issue. 28 C.F.R. 5.300. This it has entirely failed to do. In fact, as the discussion below reveals, the uncontroverted evidence is that defendant is an agent of the IRA, providing money and services for other than relief purposes.

██ The final affirmative defense, that this action is the result of unlawful electronic surveillance in violation of 18 U.S.C. §§ 2510–20, 3504, and the fourth amendment, must be disregarded for similar reasons. The allegation is based upon information and belief; no affidavits or other evidence has been submitted by defendant explaining the basis for this belief. Instead, defendant's sole argument in support of this claim is that the Ahearn affidavit, which denied the allegation and specified two federal agencies which were canvassed, "lacks the evidentiary detail necessary to enable the court to determine the issue of whether or not illegal electronic surveillance was used by the government in connection with the present case." Durkan affidavit, ¶ 28. This recitation, however, is insufficient even to have required a response on the part of the Attorney General, let alone to survive a motion for summary judgment. As the Second Circuit has explained,

> "Although it has been said that a claim that illegal surveillance occurred need not be particularized, *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974), it is now established that it cannot be based on mere suspicion but must have at least a 'colorable basis' before the government will be obliged to respond. *United States v. Yanagita*, 552 F.2d 940, 943 (2d Cir. 1977); *In re Millow*, 529 F.2d 770 (2d Cir. 1976). James set forth no basis for suspecting the existence of such surveillance other than a conclusory allegation that the participation of the Strike Force in the investigation made such an event more likely than not. This allegation was insufficient to call for an all-agency search." *United States v. James*, 609 F.2d 36, 51 (2d Cir. 1979).

In the case at bar, defendant has not even asserted that it is "more likely than not" that illegal investigative techniques were employed. In fact, as will be seen below, plaintiff's case rests entirely on defendant's registration statements, which are in the public domain, and on documents obtained from defendant's files during discovery and under the express authority of the Act. 22 U.S.C. § 615; 28 C.F.R. § 5.501. Nevertheless, the Government denied the claim, stating that a search of the Department of Justice records reveals no instance of unlawful electronic surveillance. Under all of the circumstances herein, that denial is sufficient to negate the defense. Defendant's reliance on *In re Quinn*, 525 F.2d 222 (1st Cir. 1975), in which the Court required an all-agency search to support the government's denial, is misplaced; in *Quinn*, unlike the instant case, the claimant made "specific charges" supported by affidavits.

V.

Having decided the issues raised by the affirmative defenses in plaintiff's favor, I turn next to defendant's conduct for which plaintiff desires injunctive relief.

A. *Defendant's Representation of the IRA*

The Act defines the term "agent of a foreign principal" as:

> "(1) any person who acts as an agent, representative, employee, *or* servant, *or* any person who acts in any other capacity at the order, request, *or* under the direction *or* control, of a foreign principal or of a person any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign principal, and who directly or through any other person—
> "(i) engages within the United States in political activities for or in the interests of such foreign principal;
> "(ii) acts within the United States as a public relations counsel, publicity agent, information-service employee or political consultant for or in the interests of such foreign principal;

"(iii) within the United States solicits, collects, disburses, or dispenses contributions, loans, money, or other things of value for or in the interest of such foreign principal; or

"(iv) within the United States represents the interests of such foreign principal before any agency or official of the Government of the United States; and

"(2) any person who agrees, consents, assumes or purports to act, as or who is or holds himself out to be, whether or not pursuant to contractual relationship, an agent of a foreign principal as defined in clause (1) of this subsection."

22 U.S.C. § 611(c) (emphasis added).[10]

■ It is clear from the legislative history that before requiring an organization to register as an agent of a specific foreign principal, the Attorney General must establish the existence of an agency relationship. Defendant insists that such an agency relationship is defined only by control, and cites the Restatement (Second) of Agency, § 1.[11] In this connection, defendant correctly notes that the Act is not intended to cover "persons who are not, in fact, agents of foreign principals but whose acts may incidentally be of benefit to foreign interests, even though such acts are part of the nor-

mal exercise of those persons' own right of free speech, petition, or assembly." H.R. Rep.No.1470, 89th Cong., 2nd Sess., reprinted in [1966] U.S.Code Cong. & Ad.News 2397, 2401.

■ The plain language of § 611(c)(1), however, supports plaintiff's contention that "control" as used either in § 611 or in the classic Restatement definition of agency is not the sole test of an agency relationship under the Act. As a matter of statutory construction, the use of the disjunctive, highlighted in the above-quoted section, is dispositive. The Supreme Court, interpreting the clause "business or property" in Section 4 of the Clayton Act, 15 U.S.C. § 15, has instructed:

"That strained construction would have us ignore the disjunctive 'or' and rob the term 'property' of its independent and ordinary significance.... In construing a statute we are obliged to give effect, if possible, to every word Congress used. United States v. Menasche, 348 U.S. 528, 538–539 [75 S.Ct. 513, 519–20, 99 L.Ed. 615] (1955). Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise; here it does not. See FCC v. Pacifica

---

**10.** Pursuant to 22 U.S.C. § 611(d):

"The term 'agent of a foreign principal' does not include any news or press service or association organized under the laws of the United States or of any State or other place subject to the jurisdiction of the United States, or any newspaper, magazine, periodical, or other publication for which there is on file with the United States Postal Service information in compliance with section 3611 of Title 39, published in the United States, solely by virtue of any bona fide news or journalistic activities, including the solicitation or acceptance of advertisements, subscriptions, or other compensation therefor, so long as it is at least 80 per centum beneficially owned by, and its officers and directors, if any, are citizens of the United States, and such news or press service or association, newspaper, magazine, periodical, or other publication, is not owned, directed, supervised, controlled, subsidized, or financed, and none of its policies are determined by any foreign principal defined in subsection (b) of this section, or by any agent of a foreign

principal required to register under this subchapter."

**11.** That section states:

"(1) Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.

"(2) The one for whom action is to be taken is the principal.

"(3) The one who is to act is the agent." Comment (a) provides:

"The relation of agency is created as the result of conduct by two parties manifesting that one of them is willing for the other to act for him subject to his control, and that the other consents so to act. The principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on the principal's behalf and subject to his control. Either of the parties to the relation may be a natural person, groups of natural persons acting for this purpose as a unit such as a partnership, joint undertakers, or a legal person, such as a corporation."

*Foundation*, 438 U.S. 726, 739–740 [98 S.Ct. 3026, 3035, 57 L.Ed.2d 1073] (1978)." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338–39, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979).

In the case at bar, there is no indication that the disjunctive "or" means anything but what it says. Accordingly, it is not necessary for plaintiff to prove that defendant is an "agent," in the Restatement sense,[12] or a "person who acts in any other capacity . . . under the direction or control" of the IRA; it is sufficient to establish agency under the Act that defendant is a "representative" of the IRA, or acts at its "request."

▊ Plaintiff's exhibits unequivocally establish the necessary relationship between defendant and the IRA. Citation of some of defendant's correspondence will illustrate this conclusion:

"[W]e are doing everything possible to help the Provisional I.R.A. in Ireland, this is the organization that are [sic] doing the fighting, and doing everything possible to help and protect our suffering people in Northern Ireland." Letter to Frank Drum, October 27, 1971.

"Our support goes exclusively to the Provisional I.R.A. and those who are working with them. As to references we can refer you to those who are listed on our letterhead. They are names well known to you." Letter to Patrick Stack, October 27, 1971.

"Since November 23rd, however, the Republican Movement in Ireland have [sic] issued a strong directive to Irish Northern Aid in America requiring all monies solicited in their name to be directed through the National Headquarters of Irish Northern Aid in New York." Letter to Pat Roche, jointly signed by each of defendant's U. S. representatives, December 26, 1974.

"You were perfectly correct to regard the inspired gossip one of your good members heard in Toronto about the Provisional I.R.A. being loaded with money in Dublin banks or elsewhere.

\* \* \* \* \* \*

"Thanks to the continuing generous support from our friends . . ., they have been able to meet the very heavy demands on them to finance all their necessary activities . . .

\* \* \* \* \* \*

"If our people here can continue to supply funds, our people in the North can continue the struggle." Letter to Nelson McGee from Jack McCarthy, May 9, 1972, responding to a letter requesting "someone in the upper echelon to squelch this rumor."

"The IRA stands for the Irish Republican Army. . . . Its objective is a free and united Ireland.

\* \* \* \* \* \*

"Help us to secure a UNITED, FREE, AND PEACEFUL 32 COUNTY IRELAND.

\* \* \* \* \* \*

SEND A DONATION TODAY TO THE IRISH NORTHERN AID COMMITTEE." Undated Flyer entitled "Questions and Answers on Northern Island."
"THE AIMS OF THE IRISH NORTHERN AID COMMITTEE

"1. To provide financial assistances to local defense committees, who maintain

---

**12.** *Compare* Restatement (Second) of Agency, § 1, comment (f):

"Statutory use. Whether the word 'agent' as used in a statute corresponds to the meaning here given depends, with other factors, upon the purpose of the statute. Thus, the purpose of statutes providing for substituted service of process on a public official is to satisfy the due process requirement of the United States Constitution. Although such a statute may label the public official an 'agent' for receiving service of process, he is not an agent in the sense used herein. He is not in fact designated by the one on whose account he 'accepts service', nor does he respond to that person's directions. So, in a statute which fixes the method of payment of all 'public officers and agents', the word 'agents' may be interpreted in a restricted sense to exclude a clerk employed by the state. The word 'agent' in a criminal statute does not normally include other fiduciaries such as receivers, although some statutes may be interpreted to include them."

258

the DEFENSE PATROL that protect innocent people from the violence of BRITISH IMPERIALISM.

"We are fighting a Guerilla war and will continue to do so. We the members of the Provisional Irish Republican Army will fight and die until victory is ours.... REMEMBER—The Irish Northern Aid Committee is the only organization in America that supports the Provisional I.R.A....." Untitled Flyer on INAC Letterhead, signed by Joe R. Martin, Active Service Unit 3, Belfast # 1 Brigade.

"At that stage the leaders of the Republican Movement in Ireland requested that a support movement be started in the United States and Canada to get the truth before the American people and to provide essential funds to enable our people in the North to subsist and resist. And so the Irish Northern Aid Committee was formed.

\* \* \* \* \* \*

"It has functioned well so far and has made it possible for the dependents of our jailed men and women, and those 'on the run,' to be taken care of so as to avoid damaging the morale of its prisoners, etc.

\* \* \* \* \* \*

"Those in the North who are bearing the brunt of the fight ... cannot successfully finish the job unless we continue to furnish the necessary funds. While they are making heroic sacrifices we must renew our efforts to provide the money needed.

\* \* \* \* \* \*

"In other words, get active and start to channel some badly needed funds through our office for the hard-pressed people in the North." Memo to All Units, signed by INAC's U. S. Representatives, October 28, 1974.

"The leadership of the Republican Movement in Ireland have indicated to us their wish that all fund raising efforts in the United States be directed through [INAC].

"This directive is to ensure central financial control of all moneys raised under their auspices.... They direct us to discourage parochial efforts.... Included in and subject to this policy memorandum....

\* \* \* \* \* \*

"REMEMBER—The Irish Northern Aid Committee is the only organization in America authorized by the Republican Movement in Ireland to collect money for food, clothing, etc...." Memo to All Units, signed by INAC's U. S. Representatives, November 25, 1975.

"Any unit which wishes to be sure its proceeds will be used for relief purposes need only make its remittances to the Bronx Office in the form of checks payable to An Cunann Cabhrach, the relief organization, and we will send the checks directly to them...." Letter to Alic Maher, signed by INAC's U. S. Representatives, March 14, 1978, responding to a letter stating, "The Irish community is very critical of an organization that gives aid to the families of irresponsible members of any group [referring to the 'Provisional Wing of the IRA']. If this continues we cannot support Irish Northern Aid."

"[T]he bit about daily telephone contacts with Sinn Fein is out. That method of communication did not work out and was discontinued." Letter to James Chambers from Mary Kennedy, Secretary of INAC, May 16, 1972, responding to, "I also understand that you receive a daily telephone communication from *Sinn Fein* Headquarters...."

"Our objectives are similar to yours and our channels of communication are more flexible and safe." Letter to Jeff Redmond from Jack McCarthy, May 22, 1972, responding to: "I have written to Mac Stiofain, O'Bradeigh, and Cahill, and have sent a few dollars (hope they arrived) directly. It would probably be better to support the Provisionals and Free State through you I now realize."

Needless to say, language in the above letters, all of which constitute admissions by the defendant, supports the uncontroverted assertion that defendant is a repre-

sentative of, or acts at the request of, the IRA. This conclusion was implicitly recognized by Judge Bauman when, in a separate action decided in 1972 in which the Court ordered INAC to allow the Attorney General to inspect its books and records, he stated: "The defendant [INAC] engages in activities designed to promote the cause of one faction in the dispute currently raging in Northern Ireland. Its fund raising and propaganda activities may well be designed to influence American policy or, put most charitably, may result in serious complications for the Government in the conduct of its foreign affairs." *Attorney General v. Irish Northern Aid Committee*, 346 F.Supp. 1384, 1391 (S.D.N.Y.), *aff'd without opinion*, 465 F.2d 1405 (2d Cir.), *cert. denied*, 409 U.S. 1080, 93 S.Ct. 679, 34 L.Ed.2d 659 (1972). Although that opinion as well as many of the exhibits before this Court are not very recent; defendant presents neither legally persuasive arguments nor any "concrete particulars" of fact to raise a genuine issue as to defendant's continuing agency relationship with the IRA.

The unsubstantiated denial in defendant's answer and in the Durkan affidavit that defendant does not represent the IRA is insufficient to compel a trial. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980); *Research Automation, supra*, 585 F.2d at 33; *Beal v. Lindsay*, 468 F.2d 287, 291 (2d Cir. 1972).[13] Defendant, on an earlier motion brought by plaintiff before Magistrate Sinclair to compel answers to plaintiff's interrogatories, asserted that only three persons—Matthew Higgins, John McCarthy and Michael Flannery, defendant's U. S. Representatives— had any substantial knowledge on the matters raised in this action. Defendant's Brief in Opposition to Plaintiff's Motion to Compel, at 4; *see* Affidavits of Matthew

Higgins, sworn to March 6, 1979; Michael Flannery, sworn to February 28, 1979; and John McCarthy, sworn to March 5, 1979, reiterating that they are the only three persons with knowledge sufficient to answer plaintiff's interrogatories; *see* note 6 *supra*. Each of the three has invoked his fifth amendment privilege against self-incrimination. The only conclusion that can be reached from these assertions is that Durkan, who is not an officer of defendant, does not possess the personal knowledge necessary to raise his denial that defendant is an agent of the IRA to the level of a genuine issue of fact for trial. *See* F.R. Civ.P. 56(e). Nor is it sufficient for defendant to suggest simply that this relationship is a question for the Court to decide after a trial. Defendant has not suggested that any additional evidence would be adduced at trial, or that its three officers would, at that time, waive their fifth amendment privilege and shed new light on the issue. In any event, defendant's time for coming forth with "concrete particulars" has passed; defendant "cannot make a secret of his evidence, holding it close to his chest until the trial." *Research Automation, supra*, 585 F.2d at 33.

Defendant further argues that the references in the above-quoted documents to the "Republican Movement" and the "Republican Leadership" raises a triable issue of fact as to whether those terms are "euphemisms synonymous" with the IRA. Durkan affidavit, ¶ 17. Defendant contends that this is an inadmissible conclusion drawn by Ahearn. *See* Ahearn affidavit, ¶ 9. Under the doctrine of judicial notice, the Court can observe that the "Republican movement" consists of groups other than, and in addition to, the IRA; but the Court can also notice that the IRA is a "Republican move-

---

**13.** The *Beal* Court expounded on the appropriate use of a motion for summary judgment:

"The rule of *Arnstein v. Porter*, 154 F.2d 464, 468 (2 Cir. 1946), that summary judgment may not be rendered when there is the 'slightest doubt' as to the facts no longer is good law. *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–290, 88 S.Ct. 1575, [1592–93] 20 L.Ed.2d 569 (1968);

*Dressler v. MV Sandpiper*, 331 F.2d 130 (2 Cir. 1964). When the movant comes forward with facts showing that his adversary's case is baseless, the opponent cannot rest on the allegations of the complaint but must adduce factual material which raises a substantial question of the veracity or completeness of the movant's showing or presents countervailing facts." 468 F.2d at 291.

ment," at least insofar as it advocates a united Ireland. If this were the only evidence on this point, there would be a triable issue of fact as to the meaning of the "Republican movement" within the context of this case. But defendant does not deny the inescapable conclusion that results from reading the exhibits in this case as a whole—that defendant's reference to the Republican movement or leadership is a reference to the IRA. In fact, defendant's own material uses the terms interchangeably. It suffices to cite just one example, a flyer sent from INAC headquarters concerning Joe Cahill:

> "Joe has been closely associated with the defense of Belfast since August last. He is one of the strongest supporters of the Provisional Army Council in the Six Counties and one of the strongest opponents of any deviation from the fundamental Republican position. He believes that Ireland's freedom can only be achieved by force of arms. Accordingly, he believes that a strong I.R.A. is vital to the Irish national interest."

Defendant has come forth with no substantiated assertions from which it could be inferred that it does not represent or act at the request of the IRA in respect of the activities enumerated in 22 U.S.C. § 611(c)(1)(i)–(iv), nor has it attempted to suggest that such evidence could be developed at a trial on the merits. Accordingly,

plaintiff is entitled to an injunction ordering defendant to list the IRA as its foreign principal, with respect to both past and future registration statements, as well as the labelling requirements of 22 U.S.C. § 614.

Moreover, with respect to the presently disclosed principal—the Northern Aid Committee—it does not necessitate argument or a trial to determine that defendant, by not providing a street and number in Belfast at which the principal can be located, has not provided the requisite address for the Committee. See 22 U.S.C. § 612(a)(3); Initial Registration Statement, question 6.

### B. Identification and Registration of Defendant's Officers, Affiliates, Etc.

1. Pursuant to the regulations promulgated under the Act by the Attorney General, officers, directors, employees, and agents of INAC must file a short-form registration statement. 28 C.F.R. § 5.202.[14] Accordingly, statements prepared by Michael Flannery, John McCarthy, and John McGowan were filed along with INAC's initial registration statement. In addition, it appears from the exhibits that Matthew Higgins, who became a representative of defendant in September, 1974, following the death of John McGowan, also filed a short-form statement, see Jan. 1975 Reg. Statement, question 27; there are other short-forms in the file as well.

---

14. 28 C.F.R. § 5.502 provides:

"(a) Except as provided in paragraphs (b), (c), and (d) of this section, each partner, officer, director, associate, employee, and agent of a registrant is required to file a registration statement under the Act. Unless the Assistant Attorney General specifically directs otherwise, this obligation may be satisfied by the filing of a short form registration statement.

"(b) A partner, officer, director, associate, employee, or agent of a registrant who does not engage directly in activity in furtherance of the interests of the foreign principal is not required to file a short form registration statement.

"(c) An employee or agent of a registrant whose services in furtherance of the interests of the foreign principal are rendered in a clerical, secretarial, or in a related or similar capacity, is not required to file a short form registration statement.

"(d) Whenever the agent of a registrant is a partnership, association, corporation, or other combination of individuals, and such agent is not within the exemption of paragraph (b) of this section, only those partners, officers, directors, associates, and employees who engage directly in activity in furtherance of the interests of the registrant's foreign principal are required to file a short form registration statement.

"(e) The short form registration statement shall be filed on Form DJ–305. Any change affecting the information furnished with respect to the nature of the services rendered by the person filing the statement, or the compensation he receives, shall require the filing of a new short form registration statement within 10 days after the occurrence of such change. There is no requirement to file exhibits or supplemental statements to a short form registration statement."

Ahearn asserts that in reviewing defendant's records, he has "found a number of persons who have acted as, or are acting as agents, employees, or associates of the defendant and who because of their activities for or on behalf of the defendant became obligated to register under the Act pursuant to Section 612 and 28 C.F.R. 5.202e but who have not filed the required short-form registration statement." Ahearn affidavit, ¶ 17. None of these persons, as yet unidentified, are joined as parties to this action; accordingly, this suit is not the proper vehicle to enforce their individual compliance. See Attorney General v. INAC, No. 77–708 (S.D.N.Y. Oct. 6, 1977), slip op. at 5–6.

Nevertheless, to accomplish its goal of full disclosure, the Act does impose certain reporting obligations on INAC with respect to these persons. In question 4 of the supplemental forms, INAC is required to disclose whether any persons have become "partners, officers, directors or similar officials," and if so, INAC must provide their name, address, citizenship, and position. In question 5, the registrant must identify each person named in question 4 who has "rendered services directly in furtherance of the interests of any foreign principal." In question 7, INAC must name all employees, other than those hired in a secretarial or clerical capacity, who render services directly in furtherance of the foreign principal. Question 27 asks whether each person named in questions 5 and 7 have filed short form registration statements, and requires INAC to name those persons who have not done so.

INAC's responses to these questions are often inconsistent and incomplete. For example, in the July 1975 form, defendant states that no persons have become officers or directors (question 4), but then states that the persons listed in question 4 render services "[o]nly to the Irish Northern Aid Committee." In January 1975, INAC lists Matthew Higgins as a new U. S. Representative, conceding that he renders services directly in the interest of a foreign principal, but then, in response to a direction to describe his services, INAC states no more than: "Only to the Irish Northern Aid Committee." In its initial statement, INAC admits in question 5, which requires a list of all employees, other than clerks or secretaries, who render services directly in furtherance of the interests of a foreign principal, that it has "voluntary part-time help," yet it gives no names. Defendant's conduct, of which the above is illustrative, frustrates the policy of full disclosure behind the Act, and must be corrected both with respect to past and future registration forms.

2. In response to plaintiff's allegations that defendant's statements do not reveal the nature and extent of its relationship with its chapters and affiliates, defendant recognizes its obligation, but "contends that its statements filed under the Act attempt, in good faith, to disclose as far as practicable the nature and extent of its organization." Durkan affidavit, ¶ 27. The exhibits, however, belie this contention. They are replete with correspondence in which defendant charters local chapters of INAC and with other documents in which defendant lists more than 40 "U. S. Branches," see, e.g., undated flyer on INAC letterhead, attached as Exhibit 7 to Ahearn affidavit. This documentation, the authenticity of which is not in dispute, makes clear that defendant's repeated denial in all but one of its registration statements, that it has no branch offices, is untrue. At least to the extent that it is practicable for defendant to charter local chapters and to compile for its own use a list of its branches, there is no reason under the Act why it should not disclose these affiliates to plaintiff and the public in its registration forms.

C. *Defendant's Activities*

Pursuant to 22 U.S.C. § 612(a)(4), (6), set forth in note 3 *supra*, the registration statement must include a "comprehensive statement" of all activities engaged in or to be engaged in on behalf of a foreign principal, including a "detailed statement" of all political activities, as well as a "detailed statement" of activities performed by the registrant which would require registration under the Act. A statement is "detailed"

within the meaning of the Act "when it has that degree of specificity necessary to permit meaningful public evaluation of each of the significant steps taken by a registrant to achieve the purposes of the agency relation." 28 C.F.R. § 5.210.

As a general proposition, defendant's statements concerning its activities do not give the public the guidance the Act mandates. Again, inconsistency and omission is the rule rather than the exception. The dances, rallies, films, picketing, letter writing campaigns, boycotts, appearances on radio and television, sponsorships of foreign speakers, and other fundraisers, whose existence is clear from the exhibits, are blatantly ignored on the registration statements. Many questions are simply left blank. *E.g.*, question 11 of January 1980 and July 1979 statements. Given the letters in the file to the effect that INAC received instructions from Ireland that INAC should collect all moneys intended for the foreign principal, defendant is in default of its obligation under the Act to "describe in full detail" its activities for or services rendered to a foreign principal. *See* supplemental statements, question 11. In violation of the same question, defendant has failed to disclose its function as a press office, an activity clearly established by its own records.

Defendant's responses through the years to question 12 provides another obvious example of a continued violation of the Act. The question first asks whether the registrant engaged in any political activities on behalf of a foreign principal. The term "political activities' is intended to encompass:

"the dissemination of political propaganda and any other activity which the person engaging therein believes will, or which he intends to, prevail upon, indoctrinate, convert, induce, persuade, or in any other way influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party."

22 U.S.C. § 611(*o*). If the registrant has been so engaged, it is required to "identify each such foreign principal and describe in full detail all such political activity, indicating, among other things, the relations, interests and policies sought to be influenced and the means employed to achieve this purpose. If the registrant arranged, sponsored or delivered speeches, lectures or radio and TV broadcasts, give details as to dates, places of delivery, names of speakers and subject matter."

Until and including the July 1979 statement, defendant admitted to engaging in political activities, with its typical response to the second part of the question reading as follows:

"We have continued to support the campaign to have the British troops withdraw from Ireland and British influence removed from Irish political life. We continue to advocate the unity of Ireland under a Republican form of government. We also advocate humane treatment for all political prisoners in all parts of Ireland."

Obviously, this statement is not responsive to the question nor does it describe the numerous activities that the documents reveal defendant sponsored. And the problem is further complicated rather than resolved by defendant's more recent negative response to the first prong of question 12. Despite the existence of these statements, defendant's own records reveal no change in its activities since July 1979 which would warrant a negative answer in place of an affirmative one, nor has defendant even suggested that such a reason exists. It bears repeating that under principles governing summary judgment, defendant's time to come forth with such evidence is now.

In addition to these general complaints, plaintiff seeks an injunction compelling defendant to disclose as one of its activities its involvement with the weekly newspaper,

*The Irish People.* The paper is published by the Irish People, Inc., which Ahearn alleges to be a "dummy corporation." Ahearn affidavit, ¶ 11. As noted above, the paper was the subject of a civil enforcement action brought under the Act by the Attorney General against the Irish People, Inc. to compel the defendant therein to register as an agent of a foreign principal. *Attorney General v. The Irish People, Inc.*, 502 F.Supp. 63 (D.D.C.1980). The action was dismissed, however, because of the Attorney General's insistence on withholding from the defendant therein materials critical to a dispositive defense, and the question of who controlled the newspaper was never reached by the Court.

Plaintiff's proof on this issue consists of the following. It contends on the basis of alleged statements made in the District of Columbia action that The Irish People, Inc. has no directors, officers, or stockholders of its own. It cites a letter signed by Messrs. Higgins, Flannery and McCarthy to the Trustees of the Boston Unit of INAC on December 1, 1977, which states in pertinent part:

> "The Head Office in New York shares your conviction that our main purpose is to provide financial help for the Republican Movement in Ireland. Our office expense for rent, telephone, postage, etc. is very small. The only major expense is carried out at the direct command of our sponsors in Ireland, namely, helping to keep the 'Irish People' newspaper going."

Also appended to the Ahearn affidavit is correspondence emanating from INAC in which INAC requests the former editor of *The Irish People*, Sister St. Hugh, to turn over the paper's records to INAC; in which Matthew Higgins states that INAC will give certain activities "proper backing" in *The Irish People*; in which INAC refers to *The Irish People* as "our journal" or "our paper"; in which Jack McCarthy demands an explanation as to why a certain rally was not advertised in *The Irish People*; and in which, at a monthly meeting of Unit Officers of Irish Northern Aid, Mr. Flannery is described as stating that "an Assistant Editor might be appointed if suitable candidate were found." In addition, the exhibits include the following memo to all units dated May 31, 1974:

> "As you know, our weekly paper involves a great deal of work on the part of a number of dedicated people, and it serves a very useful purpose in bringing the truth home both to our own people and others. It can only continue if our units support it.

> "Those who can sell it should do so every week and should remit the proceeds promptly, as separate items, at least once a month. Units which are running functions which could be usefully advertised, should use THE IRISH PEOPLE and should promptly pay for the requested advertisement.

> "The paper needs a steady flow of cash to remain in operation. You can make it possible. The new address of the paper is: ..."

Defendant never denies that it operates and controls the paper; rather, it "objects to" Ahearn's statement to that effect and states that the attorneys for the Irish People, Inc. and its newspaper deny the suggestion made by Ahearn. Durkan affidavit, ¶ 20. The grounds for defendant's objection appear to be that Ahearn's exhibits constitute hearsay and that the quoted phrase, "to keep the 'Irish People' going" (December 1, 1977 letter) does not establish editorial control by defendant.

If editorial control were the test of what constituted an "activity" under the Act, summary judgment on the issue would be inappropriate. Viewing the evidence in the light most favorable to defendant, the evidence supports an uncontroverted conclusion that defendant does no more than finance and participate in the administration of *The Irish People*. But this administrative function in and of itself, engaged in "at the direct command of our sponsors in Ireland," is still an activity and must be reported at least in response to question 11 of the supplemental statements. Moreover, as will be demonstrated below, *see* Part IV (E) *post*, the lack of editorial control does not,

by itself, preclude a finding that defendant is in violation of the provisions of the Act governing political propaganda.

### D. *Defendant's Financial Statements*

The registrant must keep

"such books of account and other records with respect to all his activities, the disclosure of which is required under the provisions of this subchapter, in accordance with such business and accounting practices, as the Attorney General, having due regard for the national security and the public interest, may by regulation prescribe."

22 U.S.C. § 615. Section 612 specifically requires the registrant to disclose in detail all disbursements, § 612(a)(8), and the extent to which it is financed by its principal, § 612(a)(5). In addition, the rules promulgated by the Attorney General require the registrant to disclose in detail its receipts and the source thereof. 28 C.F.R. § 5.201(e). The validity of the statute and accompanying regulations have been upheld by the Second Circuit in the face of a constitutional challenge. *Attorney General v. INAC*, 465 F.2d 1405 (2d Cir. 1972), *aff'g without opinion*, 346 F.Supp. 1384 (S.D.N.Y.); *cf., INAC v. Attorney General*, 409 U.S. 1080, 93 S.Ct. 679, 34 L.Ed.2d 669 (1972) (Marshall, J., dissenting from a denial of *writ of certiorari*, stating that requirement that names of contributors be revealed may not be able, after full examination, to withstand first amendment challenge).

Even a superficial review of defendant's financial statements reveals repeated violations of the above provisions. It does not require expert testimony to conclude that the reported amount received annually by INAC does not equal the reported amount it disburses, and that in fact, the amount disbursed often exceeds the amount allegedly received. Similarly, it does not require a trial to establish that defendant has not named its contributors, nor has it disclosed the purposes of its receipts and disbursements. This omission is particularly egregious in light of the absence in the files of any cancelled checks made payable to Northern Aid Committee, and in light of defendant's own advice to certain contributors that their desire to have their contributions earmarked for relief purposes only would be respected.

### E. *Filing and Labelling of Political Propaganda*

■ In accordance with the underlying policy of keeping the public informed, the Act requires the registrant to label "political propaganda" as emanating from a registered agent of a foreign principal, § 614(b), set forth in note 4 *supra;* and to file with the Attorney General two copies thereof, as well as a dissemination report, specifying the time, place and extent of the transmittal. § 614(a), set forth in note 4 *supra.* "Political propaganda" includes:

". . . any oral, visual, graphic, written, pictorial, or other communication or expression by any person (1) which is reasonably adapted to, or which the person disseminating the same believes will, or which he intends to, prevail upon, indoctrinate, convert, induce, or in any other way influence a recipient or any section of the public within the United States with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party or with reference to the foreign policies of the United States or promote in the United States racial, religious, or social dissensions, or (2) which advocates, advises, instigates, or promotes any racial, social, political, or religious disorder, civil riot, or other conflict involving the use of force or violence. As used in this subsection the term 'disseminating' includes transmitting or causing to be transmitted in the United States mails or by any means or instrumentality of interstate or foreign commerce or offering or causing to be offered in the United States mails."

§ 611(j). As defined by the Act, a communication may be deemed political propaganda because of the subjective intent of the person disseminating the information, or

because of its objective characteristics. In the case of the former, the question of intent would normally preclude summary judgment; however, if it is clear from the face of the material that it "is reasonably adapted to" influencing a recipient, there is no issue left for a trial.

The requirements of § 614 are triggered when the registrant, for or in the interests of his foreign principal, transmits political propaganda or causes it to be transmitted to two or more persons through the United States mails or by other instrumentalities of interstate or foreign commerce. Accordingly, the registrant need not be the author of the material or otherwise exercise editorial control; it is sufficient for the purposes of the Act that he distribute political propaganda for or in the interests of the foreign principal, intending it to be disseminated among two or more persons.

Section 614 also requires that a registrant, acting for or in the interests of his principal, label political propaganda transmitted to, or certain requests of, agencies or officials of the Government, including members of Congress. § 614(e), set forth in note 4 *supra*. In addition, before a registrant may testify before a congressional committee for or in the interests of a foreign principal, he must furnish the committee with a copy of his most recent registration statement. § 614(f), set forth in note 4 *supra.*

In paragraph 2 of the Ahearn affidavit, plaintiff concedes that defendant has at times complied with § 614. In December, 1971, defendant filed the requisite two copies of one press release, one flyer, and two newspaper advertisements with a dissemination report. The press release and flyer were properly labelled; the ads were not. In June, 1972, defendant filed one copy each of three advertisements, each properly labelled, along with a dissemination report. No other dissemination reports have been filed, although defendant did file one copy of a properly labelled booklet entitled *Focus: The Irish Question* in 1975.

A comparison of the answers in defendant's registration statements concerning the dissemination of political propaganda with the records of what political propaganda has been filed with the Attorney General, permits of no other conclusion but that defendant is in repeated violation of § 614. Defendant freely admits in its supplemental statements that it has "prepare[d], disseminate[d], or cause[d] to be disseminated" political propaganda with respect to Northern Aid Committee during the preceding six months. Defendant further admits to having used press releases, radio or television broadcasts, speeches, and letters or telegrams, and to have contacted legislators, newspapers, and donors. These concessions appear in the supplemental statements filed in January 1973; July 1973; January 1974; July 1974; January 1975; July 1975; January 1976 (by implication, defendant does not answer yes or no to the question whether it disseminated political propaganda, but then gives the name of the foreign principal in whose interests the propaganda was disseminated and specifies the medium used); July 1976; January 1977 (same as January 1976); January 1978 (defendant first asserts it has not disseminated political propaganda; then states it has disseminated propaganda to its own units only); July 1978 (defendant first asserts it has not disseminated political propaganda; then states it has disseminated "pamphlets or other publications" to legislators and casual passers-by); January 1979; July 1979; and January 1980 (same as January 1976). Moreover, in some statements, defendant admits that compliance with the labelling and filing requirements of § 614 "was too sketchy to be justified—will amend" or that defendant "missed some" of the items; other times it flatly states no or leaves blank the questions whether it has complied with § 614. These concessions, which constitute admissions by defendant that it has not attempted to explain or refute, support only one inference—defendant is in violation of the Act and plaintiff is entitled to an injunction ordering defendant to abide by § 614. Moreover, the letters in the file addressed to Government officials, although by their express terms requesting "information or advice with respect to any matter

pertaining to the political or public interests . . . or relations of a foreign country or . . . pertaining to the foreign . . . policies of the United States," § 614(e), are not prefaced with the requisite label.

Defendant's opposition on this point is essentially that the determination of what is or is not political propaganda is one for the Court after a trial. Durkan affidavit, ¶¶ 22, 23. This argument fails for two reasons. First, to the extent that characterizing material as political propaganda is dependent upon the subjective intent or belief of the registrant, defendant's admissions in its registration statements to the effect that it has disseminated political propaganda unequivocally manifest the requisite intent. Second, insofar as an objective test governs what constitutes political propaganda, an examination of the various flyers and advertisements appended to the Ahearn affidavit reveals that they are material "which is reasonably adapted to . . . prevail upon, indoctrinate, convert, induce, or in any other way influence a recipient," and which have been disseminated in the interests of a foreign principal. Suffice it to cite words and phrases such as "oppressed," "persecuted," "political prisoners in jails as a direct result of the British presence in Ireland," "British-occupied Ireland," "savage British soldiers," "torture," "British Troops have murdered 300 men, women and children," which are interspersed in material seeking financial assistance for the people in Northern Ireland. Again, it bears repeating that defendant has come forward with not a shred of evidence that an issue of fact lurks within the uncontroverted affidavit submitted on plaintiff's behalf.

## VI.

Plaintiff seeks summary judgment dismissing each of defendant's four counterclaims on various grounds. First, plaintiff alleges that defendant, in response to discovery demands, failed to substantiate its claims, providing no particulars as to when or how any of the alleged illegal acts occurred. See, e.g., Defendant's Response to Plaintiff's Interrogatory 25. Moreover,

plaintiff asserts that the Court lacks subject matter jurisdiction over defendant's claims for damages. Specifically, plaintiff argues that this suit was brought by the Attorney General in his official rather than individual capacity. Accordingly, the counterclaims, which do not name any particular Attorney General, are directed at the office of the Attorney General, and must be deemed a suit against the United States since any damage award would be paid from the United States Treasury. See, e.g., Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); Estate of Watson v. Blumenthal, 586 F.2d 925 (2d Cir. 1978); Ferraro v. Thomas, No. 79–5723 (S.D.N.Y. July 3, 1980). The United States is immune from suit absent an express waiver of sovereign immunity, e.g., United States v. Testan, 424 U.S. 392, 399, 96 S.Ct. 948, 953–54, 47 L.Ed.2d 114 (1976); United States v. Sherwood, 312 U.S. 584, 61 S.Ct. 171, 85 L.Ed. 408 (1941); plaintiff contends that none of the jurisdictional statutes relied on by defendant constitutes such a waiver. Insofar as the counterclaims are tortious in nature and may fall within the purview of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 et seq., plaintiff notes that defendant does not rely on the FTCA, nor has it alleged compliance with the prerequisite of first presenting an administrative claim to the appropriate federal agency. 28 U.S.C. § 2675(a). Finally, plaintiff contends that defendant cannot assert counterclaims on behalf of its representatives.

Turning first to the latter point, the four counterclaims, to the extent they are asserted on behalf of INAC's representatives, fail for two reasons. First, defendant lacks standing to assert its representatives' personal claims. The representatives have not been named as parties to this action nor have they sought leave to intervene. Second, the representatives have each invoked their fifth amendment privilege against self-incrimination, and as such the counterclaims asserted on their behalf must be dismissed. That is because "[t]he plaintiff who retreats under the cloak of

the Fifth Amendment cannot hope to gain an unequal advantage against the party he has been chosen to sue. To hold otherwise would, in terms of the customary metaphor, enable plaintiff to use his Fifth Amendment shield as a sword. This he cannot do." *Wehling v. CBS*, 608 F.2d 1084, 1087 (5th Cir. 1979); *see* Kaminsky, *Preventing Unfair Use of the Privilege Against Self-Incrimination in Private Civil Litigation: A Critical Analysis*, 39 Brooklyn L.Rev. 121, 143–44.

█ With respect to the claims asserted on INAC's own behalf, the record is devoid of any factual substantiation. Defendant's answers to plaintiff's interrogatories contain no particulars; rather, they may be characterized as vague and uninformative. The Durkan affidavit sets forth no facts, or even opinion or innuendo, concerning any alleged illegal behavior on the part of plaintiff, and defendant's Brief in Opposition does not even address plaintiff's motion for summary judgment on the counterclaims. Moreover, with respect to the third counterclaim, which alleges a claim under the Privacy Act and which is identical to a counterclaim that was asserted in the original answer and dismissed by the undersigned on plaintiff's motion, *Attorney General v. INAC*, No. 77–708 (S.D.N.Y. Oct. 6, 1979), defendant has suggested no reasons why that earlier opinion should not be adhered to herein.

Obviously, defendant has come forth with nothing to defeat summary judgment dismissing the counterclaims. In defending against such a motion, "an adverse party may not rest upon mere conclusory allegations or denials." *Dressler v. The MV Sandpiper*, 331 F.2d 130, 133 (2d Cir. 1964). In the case at bar, there is simply no evidence to review; *a fortiori*, there can be no material issues of genuine fact for a trial.

### CONCLUSION

█ There are no triable issues of fact. Plaintiff is entitled to judgment as a matter of law on the complaint and counterclaims. An appropriate permanent injunction shall issue.

Settle judgment on seven (7) days' notice.